[No. A034103. First Dist., Div. Five. Oct. 28, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER LYNN LOUDERMILK, Defendant and Appellant.

COUNSEL

J. Bradley O'Connell, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Martin Kaye and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LOW, P. J.**—Defendant Peter Lynn Loudermilk pleaded no contest to charges of assault with a firearm (Pen. Code, § 245, subd. (a)(2)) and to a Penal Code section 12022.7 allegation (inflicting great bodily injury with intent to inflict such injury). Prior to his plea, defendant made a motion to suppress (Pen. Code, § 1538.5), which was denied. He appeals from the judgment, challenging the denial of his suppression motion (Pen. Code, § 1538.5, subd. (m)). We affirm.

Benjamin Bill was sleeping in a tree grove near a highway ramp. He was awakened around 3 a.m. by what sounded like three firecrackers. Bill had been shot below the right earlobe and the bullet exited at the right base of his chin.

When the officers arrived on the scene, they obtained from Joey Lightfoot a description of the man who had fired the shots. Lightfoot described a White male, approximately five feet, eight inches tall, average build, wearing a long-sleeve shirt and dark pants, and carrying a .22 caliber pistol. Lightfoot also stated that he saw the individual run east along Dry Creek Road toward Healdsburg. The police broadcasted the description.

Deputy Sheriffs Sanford Geaslin and Bob Haran responded to the broadcast, and, at 4:30 a.m., while searching north of Healdsburg on Highway 101, they spotted defendant hitchhiking. Defendant's appearance matched the broadcast description. Officer Geaslin requested defendant to produce identification; defendant responded that he didn't have any. Officer Geaslin then patsearched him for weapons, but found none. The officer did, however, feel a wallet in defendant's right rear pocket. Officer Geaslin reached in, removed the wallet, opened it up and began searching for identification.

Upon opening the wallet, Geaslin saw two pieces of paper with several names on them, which he gave to Officer Haran. Geaslin also gave Haran some pieces of identification from defendant's wallet, which Haran took to the car and used to run an identification check. At that point, defendant began crying and saying, "I shot him. Something went wrong in my head. I thought he was going to shoot me, so I shot him." Defendant also said, "Come on, I'll show you where the gun is by the old boxcar." Geaslin noted that defendant was "real excited" and "obviously stressed out." Geaslin then handcuffed him, placed him in the car, and defendant then led the officer to several different spots where he said the gun was located. However, they could not find the gun.

Defendant was taken to the police station where Detective Gary Giovannoni read him his *Miranda* rights. At that time, he declined to make a

statement. Several hours later, defendant wanted to talk to Giovannoni. Defendant told Giovannoni that he wanted to show him where the gun was. Giovannoni advised him that his *Miranda* rights had been given, but defendant insisted on telling him where the gun was. Defendant then led Giovannoni to the location of the gun. An expert from the police department stated that it was his opinion that this gun fired the bullets which were found in the area where Bill was shot.

At the suppression hearing, defendant argued that the search and seizure of his wallet was unlawful and the confession was the unlawful fruit of that search. Specifically, he argued that a frisk pursuant to *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], is permissible only when the officer suspects the detainee to be carrying weapons, and the seizure of the wallet cannot be justified on this ground.

The trial court denied the motion, ruling that the seizure of the wallet to ascertain defendant's identity was reasonable under federal constitutional law.

■ On appeal, we review the evidence in a light favorable to the trial court's ruling on the suppression motion. We uphold those express or implicit findings of fact by the trial court which are supported by substantial evidence. However, we must independently determine whether the facts support the court's legal conclusions. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597-598 [174 Cal.Rptr. 867, 629 P.2d 961].) The exclusion of evidence is not mandated unless the seizure was in violation of the federal exclusionary rule under the Fourth Amendment to the United States Constitution. (*In re Lance W.* (1985) 37 Cal.3d 873, 896 [210 Cal.Rptr. 631, 694 P.2d 744].)

I

■ We conclude that the seizure of defendant's wallet for purposes of identification was within the scope of the investigative detention. In *Terry* v. *Ohio, supra,* the Supreme Court recognized the authority of a police officer to conduct a limited investigative detention of persons he reasonably suspects are involved in criminal activity and to subject that person to a patdown search for weapons where the officer has reason to fear for his safety. (392 U.S. at p. 30 [20 L.Ed.2d at p. 911].) The issue before the *Terry* court was a narrow one and the justices expressly declined to comment about other actions an officer could take in furtherance of a lawful investigative detention. (At p. 16 [20 L.Ed. 902-903].) Contrary to defendant's contention, the *Terry* court did not proscribe all searches of a suspect temporarily detained. ■ That determination must be made under the general Fourth Amendment standard of reasonableness and depends " 'on a balance

between the public interest and the individual's right to personal security free from arbitrary interference by law officers.' [Citation.]" (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 109 [54 L.Ed.2d at pp. 331, 336]; *Terry v. Ohio, supra,* at pp. 20-21 [20 L.Ed.2d at pp. 905-906].)

■■■ We see no constitutional proscription against asking a *Terry* suspect to identify himself. Inquiries of the suspect's identity, address and his reason for being in the area are usually the first questions to be asked and may immediately dispel the officer's suspicions. Indeed, in *Terry,* the initial inquiry by the officer of the suspects was to ask their names. (*Terry v. Ohio, supra,* 392 U.S. at pp. 6-7 [20 L.Ed.2d at pp. 897-898]; see also *Peters v. New York,* decided with *Sibron v. New York* (1968) 392 U.S. 40, 49 [20 L.Ed.2d at pp. 917, 926-927].) Without question, an officer conducting a lawful *Terry* stop must have the right to make this limited inquiry, otherwise the officer's right to conduct an investigative detention would be mere fiction. Defendant does not contend otherwise.

As part of this inquiry, the police officer may require the suspect to produce proof of identification, if he has it. The suspect has no constitutional right to keep his identity a secret under the circumstances existing here. If he refuses to identify himself to the officer, this fact may by itself be considered suspect and together with surrounding events may create probable cause to arrest. Likewise, the *Terry* suspect may not lie to the officer with impunity about his identity if there is a quick and minimally intrusive method of resolving the doubt. It is commonplace in our society for traffic officers to require motorists to remove their driver's license from their wallets when stopped by the officer. To require defendant in this case to display his driver's license or other proof of identification is a minor intrusion which is strictly limited to the sole justification of the detention. (See *Terry v. Ohio, supra,* 392 U.S. at p. 29 [20 L.Ed.2d at pp. 910-911]; *People v. Long* (1987) 189 Cal.App.3d 77, 88 [234 Cal.Rptr. 271].)

■■■ Applying those standards to the instant case, we find that Officer Geaslin acted reasonably in requesting defendant to produce identification. Defendant replied that he did not have any. Having discovered defendant's wallet during a lawful patdown search for weapons, the officer was justified in taking it from defendant's pocket to identify him. The seizure of defendant's wallet under these circumstances was reasonably related to the purpose and scope of the investigative detention. The officer was not conducting a general "fishing expedition" for whatever evidence he could find, but sought merely to learn defendant's identity. As such, the papers observed by the officers while searching for identification were lawfully seized and defendant's spontaneous confession was not the fruit of any illegal search.

Neither *Kolender* v. *Lawson* (1983) 461 U.S. 352 [75 L.Ed.2d at p. 903, 103 S.Ct. 1855], nor *Brown* v. *Texas* (1979) 443 U.S. 47 [61 L.Ed.2d at p. 357, 99 S.Ct. 2637], cited by defendant, prohibits the search that occurred here. In *Brown,* the officer stopped defendant in a " 'high problem drug area.' " Without suspecting him of any specific criminal misconduct or having any reason to believe he was armed, the officer frisked him, but found nothing. Defendant refused to identify himself and he was arrested for violating a state statute which makes it a crime for a person to refuse to give his name and address to an officer " 'who has lawfully stopped him and requested the information.' " (*Brown* v. *Texas, supra,* at p. 49 [61 L.Ed.2d at p. 361].) The court reversed the conviction, finding the initial detention was unlawful since the officers had no specific basis for believing defendant was involved in criminal activity. (At pp. 52-53 [61 L.Ed.2d at pp. 362-363].)

In *Kolender,* the Supreme Court struck down a California statute as unconstitutionally vague. That statute (Pen. Code, § 647, subd. (e)) required a *Terry* suspect to produce "credible and reliable" identification and to account for his presence when requested by a police officer. The court found that the statute, as presently drafted and interpreted by the state courts, contains no standard for determining what a suspect has to do to satisfy the requirement to provide "credible and reliable" identification. (*Kolender* v. *Lawson, supra,* 461 U.S. at p. 358 [75 L.Ed.2d at pp. 909-910].) As such, the statute vested complete discretion in the hands of the police officer to determine whether the suspect satisfied that statute (*ibid.*), which violates the constitutional requirements of definiteness and clarity. (At p. 361 [75 L.Ed.2d at p. 911].)

Neither case could be interpreted to prevent a police officer from demanding that a *Terry* suspect produce proof of identification. Further, nothing in those or other cases cited by defendant prevents an officer from seizing a wallet found during a lawful patdown search after that suspect has lied to the officer that he had no identification. The discovery of the wallet under those circumstances is purely fortuitous. Once the officer found the wallet, it presents only a minor intrusion to look inside for identification, the same proof of identification the suspect was required to produce in the first instance. To require the officer to ignore the wallet and allow defendant to continue his deception would reduce the right to conduct a lawful detention to a nullity. Our interpretation of the Fourth Amendment does not command such an absurd result. In a strikingly similar case, the Wisconsin Supreme Court held that an officer was justified in seizing a suspect's wallet during a lawful *Terry* stop where the suspect refused to identify himself. (*State* v. *Flynn* (1979) 92 Wis.2d 427, 446 [285 N.W.2d 710, 718].) That court rejected defendant's contention that the officer has no recourse when the suspect refuses to provide identification. (*Id.,* at p. 444 [285 N.W.2d at

pp. 717-718].) The court reasoned that "unless the officer is entitled to at least ascertain the identity of the suspect, the right to stop him can serve no useful purpose at all." (*Id.,* at p. 442 [285 N.W.2d at p. 716].) Here, as in *Flynn,* the investigation was no longer than necessary and the search and seizure was narrowly tailored to effectuate the purpose of the detention.

 We must emphasize that we do *not* hold that a suspect may be detained and searched merely because he either refused to identify himself or refused to produce proof of identification. Nor do we hold that each time an officer conducts a *Terry* stop he may immediately conduct a search for identification. The rule we announce does not provide officers with unfettered discretion and does not open citizens to harassment. Our decision, allowing the officer to seize the wallet, is limited to the unique facts of this case, where defendant lied to the officer and himself created the confusion as to his own identity. The seizure of defendant's wallet was minimal and strictly limited to the legitimate inquiry into his identity. We conclude that the seizure of defendant's wallet was reasonable within the meaning of the Fourth Amendment.

## II

 As an alternate independent ground, we conclude that the seizure of the wallet was also justified as being incident to a lawful arrest. (See *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 812-813 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].)

 Even though this issue was not raised at the suppression hearing, we may properly address this for the first time on appeal.[1] (See *Green* v. *Superior Court* (1985) 40 Cal.3d 126, 138 [219 Cal.Rptr. 186, 707 P.2d 248].) In reviewing the denial of a suppression motion, the *Green* court allowed the People to assert for the first time that the seizure of incriminating evidence was lawful under the inevitable discovery doctrine. (*Id.,* at pp. 137-138.) In doing so, the court distinguished the long line of cases which barred the prosecution from raising a new theory on appeal to support or defeat the trial court's suppression ruling. It held that considerations in those cases for the rule were not present in the case before it; i.e., the evidence supporting the new theory was fully developed below; defendant had a full opportunity to cross-examine the investigating officers; defendant was not prejudiced by lack of notice of the new theory; and it did not appear that any further evidence could have been introduced to support the defendant's argument. (*Id.,* at p. 138.)

---

[1] Pursuant to Government Code section 68081, this court requested, received and reviewed the argument of counsel on the question of the validity of the seizure as incidental to a lawful arrest.

Here, as in *Green,* the evidence of the search was fully developed at the suppression hearing; the facts were undisputed and it is unlikely that defendant could have introduced any further evidence to support his motion that the search was unlawful. As such, it does not appear that defendant was prejudiced by the failure to raise this new theory below. "To close our eyes to the clear applicability of the inevitable discovery doctrine would run contrary to the settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning. [Citations.]" *(Green* v. *Superior Court, supra,* 40 Cal.3d at p. 138.)

Moreover, this principle only comes into play in sustaining a ruling, and it would not have been relevant in those cased cited by defendant, e.g., *People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149]; *People* v. *Laiwa* (1983) 34 Cal.3d 711 [195 Cal.Rptr. 503, 669 P.2d 1278]; *Lorenzana* v. *Superior Court* (1973) 9 Cal.3d 626 [108 Cal.Rptr. 585, 511 P.2d 33]. (See *Green* v. *Superior Court, supra,* 40 Cal.3d at p. 138.)

Also, it makes no difference that the detaining officer did not himself believe he had probable cause to arrest. ■ The lawfulness of the search is examined "under a standard of objective reasonableness, without regard to the underlying intent or motivation of the officers involved." *(Scott* v. *United States* (1978) 436 U.S. 128, 138 [56 L.Ed.2d 168, 178, 98 S.Ct. 1717], fn. omitted; *People* v. *Decker* (1986) 176 Cal.App.3d 1247, 1250 [222 Cal.Rptr. 689].)

■ Probable cause to arrest exists if a man of ordinary care and prudence would be led to believe and conscientiously entertain an honest and strong suspicion that the accused is guilty. This is an objective standard which must be decided in light of the particular facts of each case. *(Terry* v. *Ohio, supra,* 392 U.S. at pp. 21-22 [20 L.Ed.2d at pp. 905-907]; *People* v. *Terry* (1970) 2 Cal.3d 362, 393 [85 Cal.Rptr. 409, 466 P.2d 961].)

■ Turning to the facts of the case, at the time Officer Geaslin took the wallet from defendant's pocket he knew the following: the defendant substantially matched the description of the assailant; he was alone, hitchhiking in the middle of the highway at a late hour; and, during a lawful patdown search for weapons, the officer found a wallet in defendant's rear pocket after defendant denied having any identification on his person. Taken together, these circumstances would warrant a reasonable man to conclude that defendant was hiding information from the officer which would connect him to the crime being investigated. At the moment he discovered the wallet, Officer Geaslin had probable cause to arrest defendant on suspicion of the attempted murder. As such, the search of the wallet would have

been a lawful search incident to a valid arrest. (See *United States* v. *Robinson* (1973) 414 U.S. 218, 224, 234 [38 L.Ed.2d 427, 434, 439-440, 94 S.Ct. 467].)

In *Arizona* v. *Hicks* (1987) 480 U.S. 321 [94 L.Ed.2d 347, 107 S.Ct. 1149], the United States Supreme Court held that officers must have probable cause in order to invoke the "plain view" doctrine. (At p. 326 [94 L.Ed.2d at p. 355].) There, officers were conducting a lawful warrantless search of an apartment when they came upon two new stereo systems which looked out of place in the "squalid and otherwise ill-appointed four-room apartment." (At p. 323 [94 L.Ed.2d at p. 353].) Suspecting it was stolen, one of the officers moved some of the components to reveal their serial numbers. It was determined that the equipment was taken in an armed robbery. In affirming the state court's decision to suppress this evidence, the court held that the movement of the equipment to ascertain the serial numbers, however slight, was a search. (At pp. 324-325 [94 L.Ed.2d at pp. 353-354].) The court concluded that the search was unlawful since the officer did not have probable cause to believe the equipment was stolen. (At pp. 327-329 [94 L.Ed.2d at pp. 355-357].) That case is distinguishable. Here, the officer discovered the wallet only after defendant lied to him about not having proof of identification. At the time the officer seized the wallet, he had probable cause to arrest defendant.

The fact that the officer did not subjectively believe he had probable cause to arrest defendant prior to searching his wallet is immaterial. In *Scott* v. *United States, supra,* 436 U.S. 128, the Supreme Court reaffirmed the principle that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." (At p. 138 [56 L.Ed.2d at p. 178]; *People* v. *Le* (1985) 169 Cal.App.3d 186, 193-195 [215 Cal.Rptr. 106].)

In summary, we hold that the seizure of defendant's wallet was proper under these circumstances, where the officer had proper grounds to detain and investigate, where defendant refused to identify himself, claiming he had no identification, and where a lawful weapons search revealed objective facts indicating falsity.

## III

 Defendant contends there is sentencing error in that the trial court relied on a single factor in aggravation—premeditation (Cal. Rules of Court, rule 421(a)(8))—which is unsubstantiated by the record. Defendant argues that the record reflects that defendant was suffering from mental

problems such that he was unable to " 'maturely and meaningfully reflect upon the gravity of his contemplated act.' [Citations.]" (*People* v. *Horn* (1974) 12 Cal.3d 290, 298 [115 Cal.Rptr. 516, 524 P.2d 1300].)

We agree that there is evidence to support defendant's contention that he was suffering from acute mental problems at the time of the crime, possibly to the point where he did not have the capacity to premeditate. However, we do not find that the trial court relied solely on premeditation alone to impose the sentence.

■ California Rules of Court, rule 421(a)(3) provides that, as a circumstance in aggravation, the fact that the victim was "particularly vulnerable" can mandate the imposition of the upper term. "Particularly . . . means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." (*People* v. *Smith* (1979) 94 Cal.App.3d 433, 436 [156 Cal.Rptr. 502].) The firing of multiple shots at an incapacitated victim constitutes "particular vulnerability" within the meaning of rule 421(a)(3). (See *People* v. *White* (1981) 117 Cal.App.3d 270, 282 [172 Cal.Rptr. 612].) We see little distinction where multiple shots are fired at a sleeping victim.

■ The trial court noted that the probation report stated that among the factors in aggravation were "that the victim was asleep at the time of the offense and was particularly vulnerable. [The Probation Department] point[s] out that premeditation is a factor as well as some planning involved in hiding the weapon." The trial court then stated that "the circumstances of the act, shooting a person while that person is asleep a number of times in the head for no reason whatsoever would show premeditation." From the totality of the trial court's statement in finding the factors in aggravation, the trial court found the victim was particularly vulnerable and that this finding was a factor to show premeditation.

In substance, if not in form, the trial court had relied on a finding of vulnerability. It need not have gone the extra step and found premeditation as a necessary consequence since a single factor in aggravation is sufficient to support the decision to impose the upper term. (See *People* v. *Castellano* (1983) 140 Cal.App.3d 608, 614-615 [189 Cal.Rptr. 692].) While we reserve judgment on premeditation, the characterization of the vulnerability of the victim is amply supported by the record. Though the sentencing court's discussion is not as precise as possible, we see no reason to remand for resentencing since it is not reasonably probable that it would produce a different result. (*People* v. *Watson* (1956) 46 Cal.2d 818 [299 P.2d 243]; *People* v. *Dozier* (1979) 90 Cal.App.3d 174, 179 [153 Cal.Rptr. 53].)

The judgment is affirmed.

King, J., and Haning, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 4, 1988. Mosk, J., was of the opinion that the petition should be granted.