Filed 10/20/14  P. v. Logan CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JAMES DAVID LOGAN,<br><br>        Defendant and Appellant. | B249913<br><br>(Los Angeles County<br>Super. Ct. No. BA400452) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig J. Mitchell, Judge.  Affirmed.

Edward J. Schulman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, State Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

_____

James David Logan (appellant) was convicted by a jury of eight counts of forcible sodomy (Pen. Code, § 286, subd. (c)(2)(a))[1] and two counts of forcible oral copulation (§ 288a, subd. (c)(2)(A)). He was sentenced to 42 years in prison. He appeals, contending the court erred in imposing consecutive full-term sentences for seven counts of sodomy and that his constitutional rights were violated when the court appointed the deputy alternate public defender as trial counsel.

### FACTUAL & PROCEDURAL BACKGROUND

*1. Factual Background*

In the early morning hours of March 29, 2012, Guadalupe Z.,[2] a transgender prostitute, was walking home on Bonnie Brae Street in Los Angeles after leaving a bar. She saw appellant, whom she knew. Appellant, who carried a stick in his hands, offered her money for sex. Guadalupe said she was not working, but appellant was insistent and followed her as she walked home. Guadalupe went into her apartment building and appellant followed her inside the gated entrance. Guadalupe continued to tell appellant she did not want to have sex with him. Appellant then cornered her, grabbed her by the hair and screamed at her. He then penetrated her anally eight times and forced her to perform oral sex on him three times. Appellant was screaming at her, and Guadalupe ran into the street. Someone called 9-1-1 to report a woman crying in a parking lot while a dark-skinned male walked away.

Security cameras at Guadalupe's building recorded the incident.

At trial, Guadalupe testified. She said she had never had sexual relations with appellant before.

The security recording was played for the jury while Guadalupe narrated it.[3] She said at one point she took a condom out of her purse to protect herself.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

[2] Guadalupe was often referred to at trial as "Lupe."

2

Guadalupe admitted she had previously been convicted of possession for sale of cocaine and second degree burglary as well as for prostitution. Guadalupe also admitted that when police responded to the 9-1-1 call, she gave them a false name because she was afraid.

Appellant testified in his own defense. He testified he had sex with Guadalupe once before, when he encountered her on Bonnie Brae Street and she had asked him for a date. On March 29, 2012, Guadalupe again asked him for a date, which he interpreted as an offer to have sex. Guadalupe requested $60, which appellant gave to her. Guadalupe suggested they go to her apartment. Appellant had been drinking, had "smoked some weed," and "had a little meth" that evening, so he carried a stick to steady himself.

When they arrived at Guadalupe's apartment building, she opened the gate and told him to wait for her while she went upstairs. Appellant said he was afraid that if she went upstairs, Guadalupe would take his money and not come back. Appellant followed her into the garage area, and Guadalupe asked for $40 more. Appellant pulled out a $20 bill and said they could go to the laundry room or near a trash can. Guadalupe told him to wait for her and appellant asked for his money back. Guadalupe walked upstairs and appellant followed her. Appellant grabbed her hair and told her to return his money. Guadalupe tried to go out the door and appellant grabbed her hair again. Guadalupe said she would have sex if he gave her the extra $20 but he had to hurry.

When the police detectives contacted appellant, he was in custody for possession of narcotics for sale. At trial, he admitted that he had not told the detectives the truth. He told the detectives he had more than two prior encounters with Guadalupe and had given her money for methamphetamine and met her at a hotel that evening. He also told detectives Guadalupe loved him and was jealous because he was "messing with another

---

[3]     The recording had no sound. Although the video appears to show appellant forcing Guadalupe to have oral sex three times, he was charged with only two counts of forcible oral copulation.

3

queen." He also admitted lying during the preliminary hearing when he said there was a conspiracy against him but explained he was bipolar.

Appellant admitted he had more than seven convictions for sales of narcotics, spanning three decades. He had been convicted of petty theft (a misdemeanor) and receiving stolen property (a felony).

### 2. Procedural Background

On December 18, 2012, appellant waived his right to counsel. As a result, at his preliminary hearing on January 15, 2013, appellant appeared in pro per. On January 29, 2013, at his arraignment on the information, he requested to be relieved of pro per status and requested appointment of counsel. Appellant told the court that Gerald Williams (DAPD Williams) from the Alternate Public Defender's office (APD's office) had previously been appointed to represent him but it had a conflict. The court then appointed bar panel attorney Christopher Armen. On February 6, 2013, appellant was not present in court, but it was determined that Armen was not on the approved list of panel attorneys and the court reappointed DAPD Williams  On February 8, 2013, appellant was present and requested reinstatement of pro per status and asked for stand-by counsel. The court granted the request for pro per status. Appellant then filed a motion for appointment of a "sex-crimes expert" which the court denied on February 22, 2013. On March 11, 2013, the court granted his request for stand-by counsel. The court ordered the Indigent Criminal Defense Attorney James Tobin to assign appellant stand-by counsel on the next court date. On March 26, 2013, appellant requested to relinquish his pro per status but refused to speak with the representative of the APD, Maryam Mazhin. The court reappointed the APD's office as trial counsel and DAPD Williams represented appellant through sentencing.

### DISCUSSION

### 1. Right to Counsel

Appellant contends the trial court's decision to reappoint DAPD Williams violated his constitutional right to be represented by conflict-free counsel.

4

A criminal defendant is guaranteed the right to assistance of counsel by the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution.

"'It has long been held that under both Constitutions, a defendant is deprived of his or her constitutional right to the assistance of counsel in certain circumstances when, despite the physical presence of a defense attorney at trial, that attorney labored under a conflict of interest that compromised his or her loyalty to the defendant.' [Citations.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 417.) Such a conflict exists when attorney's loyalty to, or efforts on behalf of, a client are threatened by his or her responsibilities to another client, a third person, or his or her own interests. (*People v. Cox* (1991) 53 Cal.3d 618, 653.)

Claims of Sixth Amendment violations based upon conflicts of interest fall under the category of ineffective assistance of counsel claims, and thus are subject to the test enunciated in *Strickland v. Washington* (1984) 466 U.S. 668, 688, which requires a defendant to show that (1) counsel's performance was deficient and (2) there is a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different. The deficient performance element is satisfied when the defendant shows that defense counsel labored under an actual conflict of interest which affected his or her performance. (*People v. Doolin, supra,* 45 Cal.4th at p. 417, citing *Mickens v. Taylor* (2002) 535 U.S. 162, 166, 171.) A presumption of prejudice arises when defense counsel actively represents conflicting interests. (*People v. Doolin, supra*, 45 Cal.4th at p. 418, citing *Mickens v. Taylor, supra,* 535 U.S. at p. 166.)

In *Doolin*, the California Supreme court concluded that in analyzing attorney conflict claims under the California Constitution, it is unnecessary to use a different analysis than that set forth in federal Constitution cases. (*People v. Doolin, supra,* 45 Cal.4th at p. 421.)

Appellant asserted that he had a conflict with the APD's office because it was representing him on another pending matter. He explained he and DAPD Williams did

not "see eye to eye on a lot of issues dealing with my case." Christopher Armen was then appointed on the unrelated drug case.

DAPD Williams, however, explained to the court that it was the opinion of the DAPD's office that it was in appellant's best interest to be represented by the same counsel on both cases.

It is not apparent what conflict of interest DAPD Williams had by representing appellant on the unrelated case. Appellant never explained why he and DAPD Williams disagreed. Appellant did not say he wanted another attorney from the APD's office or if he was asserting a conflict with the entire APD office. What is apparent is that appellant did not want DAPD Williams, since he requested pro per status rather than have Williams continue to represent him. Appellant clearly wished to have Armen represent him, but Armen, however, had been found to be ineligible for appointment because he was not on the list of approved counsel. Appellant therefore could not have the same counsel on both cases because Armen was ineligible for appointment on this case.

Even assuming an actual conflict existed between appellant and DAPD Williams on this case, appellant has failed to demonstrate the conflict adversely affected Williams' performance at trial or whether any allegedly deficient performance was attributable to the purported conflict of interest.

Appellant contends DAPD Williams' representation was lacking because during argument to the jury, Williams conceded the video was damning and that appellant's credibility was suspect because he had lied to detectives. Appellant characterizes Williams' representation as "lack luster at best" and not "zealous advocacy."

We have reviewed the transcript of closing argument. The prosecutor argued that the case was simple and was dependent on whether the jury believed appellant or the victim. She argued the 9-1-1 call and the video corroborated Guadalupe's testimony. She also argued appellant's story was internally inconsistent and that the victim was the one who was telling the truth.

DAPD Williams argued the two issues were consent and credibility. He argued the credibility attack made on appellant was based on statements he made while

6

representing himself at the preliminary hearing and while being interviewed at the hospital. He also referred to "some crazy things" appellant said while on the stand. But he reminded the jury that appellant chose to testify even though he was not required to do so and that he was presumed innocent. Williams argued that Guadalupe's occupation as a prostitute was relevant to her credibility. He then told a story about himself working in a steel mill. He recounted that he had burned his leg while doing his job and he had the choice of staying or going home. Because he had bills to pay he went back to work even though it was painful. He used the story to explain that Guadalupe was working as a prostitute but may not have wanted to do so. Williams argued that although appellant was "not the sharpest tool in the shed," he did not beat or strangle Guadalupe even though she took his money. He then explained that consent can be shown by positive cooperation, using the example of someone who buys a hot dog on a daily basis from the same vendor without exchanging words. He pointed out that Guadalupe knew appellant, knew the nature of the transaction, and positively cooperated by walking with him and offering him a condom. He argued that Guadalupe and appellant were arguing over the money, and appellant was angry because she had taken his money. He pointed out to the jury that the video showed Guadalupe taking more money from appellant and pointed at his fly, which demonstrated that she was cooperating and consenting to sex. He argued that Guadalupe was not credible, because she did not call the police and declined to cooperate with them when they showed up, including refusing a sexual assault examination. He also pointed out that she did not cooperate with police until the video surfaced. He argued the video supported appellant's version of events that she took money from him, negotiated for more and ultimately agreeing to sex. He also pointed out that appellant could not have intended to harm her because he kept trying to give her money.

When appellant moved for a new trial, the court stated, "Everyone was in this courtroom, understood that Mr. Williams presented a very reasoned, well-thought-out defense of [appellant]. It was presented in a manner that I consider to be very effective given the material that was presented during the trial. [¶] But I am also mindful of the

7

contents of the in excess of 30-minute videotape of the interaction between [appellant] and the victim in this matter, and the contents of that video simply could not be overcome even by the best of arguments."

We agree with the trial court that DAPD Williams' defense of appellant was particularly appropriate given the state of the evidence. The victim was unwavering in her testimony and the videotape allowed the jury to assess the credibility of her story versus appellant's. Williams did his best to argue the video corroborated appellant's version of the incident and attempted to downplay appellant's problematic testimony about lying to detectives. We conclude there was no showing of a deficient performance and further, no showing that any conflict of interest affected his performance at trial. There was no violation of appellant's constitutional rights to effective assistance of counsel.

### 2. *Sentencing*

At the sentencing hearing, the court heard argument from counsel and discussed the following factors in aggravation and mitigation: (a) the crime involved great violence, and a high degree of cruelty and viciousness, (b) the victim was particularly vulnerable, and (c) the duration of the event. The court indicated its preliminary inclination was to impose consecutive terms pursuant to section 667.6, subdivision (c).[4]

---

[4] It stated, "If one uses a low level of violence, one can legally satisfy an element of the offense. But if one continues to apply violence over and over again, this court believes that that excessive use of violence beyond what satisfies the element of an offense may be used to identify an aggravating factor. [¶] Certainly in this case the court observed incredible violence and cruelty and viciousness and callousness in the course of the 30- to 35-minute tape. [¶] We're not just talking about physically preventing Guadalupe from leaving, from fleeing. Every times she tries to bring this assault to a close, she is prevented from doing so. [¶] The viciousness that satisfies the aggravating factor of this rule of court goes far beyond what is necessary to satisfy the element of the offense. [¶] The court also is mindful under Rules of Court[, rule 4.421(a)(3)] as to the vulnerability of the victim. [¶] We have a situation where the altercation started with [appellant] possessing a rod or staff to gain an initial advantage over the victim. [¶] The vulnerability of this victim was not solely attributable to a weight difference. The vulnerability of this victim is such that she was alone initially in a parking structure, subsequently in a hallway late at night outside of view of any passers by or someone that

The court sentenced appellant as follows: For counts 1 through 7 (forcible sodomy, § 286, subd. (c)(2)(a)), it imposed the midterm of six years, with each of the counts to run consecutively. For count 8 (forcible sodomy, § 286, subd. (c)(2)(a)) and counts 9 and 10 (forcible oral copulation, § 288a, subd. (c)(2)(A)), it imposed the midterm of six years as to each count, but ordered those terms to run concurrently, for a total of 42 years.[5]

### a. Right to Jury Trial

Section 1170.1 provides, inter alia, that when a person is convicted of two or more felonies, the principal term shall consist of the greatest term of imprisonment imposed for any of the crimes, including applicable enhancements, and the subordinate term for each consecutive offense shall consist of one-third of the middle term for each other felony conviction for which a consecutive term of imprisonment is imposed and shall include

---

could have come to her assistance. [¶] And there was a dynamic that the court observed in the course of this sexual assault that it was so clear that Guadalupe was in . . . no position to assert herself and counter the will of [appellant.] [¶] For these reasons I find Guadalupe was particularly vulnerable during this offense. . . . [¶] The court has had ample time to reflect on what I believe is ample time in this case. [¶] Some of the factors that I have considered is the duration of this event. Again, in the vicinity of 30 to 40 minutes. [¶] In trying to deduce an appropriate sentence, the court considers its own experience as to what crimes trigger what amount of incarceration for what type of injury or victimization that is perpetrated against the victim. . . . [¶] The court's preliminary sentence will be to sentence pursuant to the dictates of [section 667.6, subdivision (c)] which allows me to impose consecutive terms for sex crimes perpetrated during a single occasion for the reasons that have been conceded by counsel and articulated by the court."

[5] The court stated, "So there is no deficiency in the record, clearly this court utilizes [section] 1170.1 in the vast majority of sentences it imposes, but I also appreciate the fact the state Legislature has created a separate sentencing scheme for the sentencing of sex offenses. [¶] And in this particular case, I believe a just and an appropriate sentence is best arrived [at] by utilizing the sentencing provisions that have been carved out for sex crimes. . . . The court is selecting the mid term as to all counts. [¶] With respect to counts 1 through 7, those counts are to run consecutive pursuant to the discretion given to the court in [section] 667.6, subdivision (c). [¶] Counts 8, 9, and 10, the court imposes six years as to each of those three remaining counts. Each count is to run concurrent with the consecutive terms as to counts 1 through 7."

one third of the term imposed for any applicable enhancements to the subordinate offense or offenses.

Section 667.6, subdivision (c) provides as follows: "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) [which includes oral copulation or sodomy] if the crimes involve the same victim on the same occasion. A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (d). . . . The term shall not be included in any determination pursuant to Section 1170.1. . . ."

Section 667.6 permits consecutive sentencing for sexual offenses, notwithstanding the fact that they were committed as part of a single transaction. (*People v. Hicks* (1993) 6 Cal.4th 784, 787.)

Appellant contends the factual basis used to support the imposition of consecutive sentences must be supported by findings made by the jury.

As appellant acknowledges, in *Oregon v. Ice* (2009) 555 U.S. 160, 163-164, the United States Supreme Court held that the Sixth Amendment does not require the jury to determine facts supporting the imposition of consecutive rather than concurrent sentences for multiple offenses.

The trial court's exercise of its discretion to impose consecutive sentences, as occurred in the case at bar, does not fall within the rule of *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490. Both the United States and California Supreme Courts have rejected the claim that any factfinding engaged in by the trial court in justifying consecutive sentences violates the right to a jury trial. (See *Oregon v. Ice, supra,* 555 U.S. at pp. 164, 168 [129 S.Ct. 711, 172 L.Ed.2d 517]; *People v. McKinzie* (2012) 54 Cal.4th 1302, 1369; see *People v. King* (2010) 183 Cal.App.4th 1281, 1324 [imposition of full consecutive terms under section 667.6 does not implicate Sixth Amendment right to jury trial].)

Appellant contends that the *Oregon v. Ice* dissent is better reasoned and thus should be followed. We decline to do so.

Appellant also contends that this case is distinguishable from *Oregon v. Ice, supra*, because the court's decision to impose full term consecutive sentences "was tantamount to an upward deviation from the statutory 'presumptive' maximum. (See *Cunningham v. California* (2007) 549 U.S. 270, 291, fn. 4 . . . .)" We disagree. The court expressly exercised its discretion to impose full consecutive terms under section 667.6, subdivision (c), explaining it was aware of the choice between consecutive sentencing under section 1170.1 and section 667.6, subdivision (c) and was using discretion granted in section 667.6, subdivision (c) to impose the harshest, most punitive sentence allowable by law.

The decision to impose full consecutive terms under section 667.6, subdivision (c), requires only a "recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c)." (*People v. Belmontes* (1983) 34 Cal.3d 335, 348 [trial court should state reasons for both general decision to sentence consecutively and specific decision to impose full consecutive terms under § 667.6, subd. (c)].) The court, therefore, specifically followed the procedure set forth in *People v. Belmontes, supra,* 34 Cal.3d at pages 347-348. It considered whether to impose consecutive sentences generally and whether to impose full consecutive terms under section 667.6, subdivision (c), and expressly stated its reasons for selecting full consecutive terms. Appellant was therefore properly sentenced to the statutory maximum for each offense and the court properly made the decision to impose consecutive sentences. (*People v. Black* (2007) 41 Cal.4th 799, 821-823.) There was no "upward deviation" as appellant claims.

### b. The Aggravating Factors Used Were Valid

Appellant contends that the aggravating factors used by the trial court to support the imposition of consecutive terms utilized elements of the crime of forcible sodomy, and thus were invalid.

With respect to the consecutive sentences, the trial court noted, it based its decision on two aggravating factors: that the crimes involved great violence and cruelty (Cal. Rules of Court, rule 4.421(a)(1)) and that the victim was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)).

11

Specifically, the court justified its decision to impose consecutive sentences on counts 1 through 7, based on the aggravating factors of "incredible violence and cruelty and viciousness and callousness . . . . [¶] The viciousness that satisfies the aggravating factor of this rule of court goes far beyond what is necessary to satisfy the element of the offense. . . . [¶] We have a situation where the altercation started with [appellant] possessing a rod or staff to gain an initial advantage over the victim. [¶] The vulnerability of this victim was not solely attributable to weight difference. The vulnerability of this victim is such that she was alone initially in a parking structure, subsequently in a hallway late at night outside of view of any passers by or someone that could have come to her assistance. [¶] And there was a dynamic that the court observed in the course of this sexual assault that it was so clear that Guadalupe was in . . . no position to assert herself and counter the will of [appellant.]"

The amount of physical force necessary to support a forcible sodomy conviction is an amount sufficient to overcome the victim's will. (*People v. Hale* (2012) 204 Cal.App.4th 961, 977-979; *see People v. Guido* (2005) 125 Cal.App.4th 566, 576.) Guadalupe testified, and the video showed, appellant pulled her hair, cornered her, and was armed with a stick as he repeatedly sodomized her and forced her to orally copulate him. The trial court's finding of excessive use of violence beyond the elements of the offense itself was fully supported by the evidence.

As for the victim's vulnerability, ""'"[v]ulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act."''" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154, quoting *People v. Loudermilk* (1987) 195 Cal.App.3d 996, 1007.) "Thus, a crime victim can be deemed particularly vulnerable as an aggravating factor [based on] the victim's relationship with the defendant and his abuse of a position of trust." (*People v. DeHoyos, supra,* 57 Cal.4th at p. 154, quoting *People v. Stitely* (2005) 35 Cal.4th 514, 575.)

Because appellant approached Guadalupe while she was walking home alone late at night, he took advantage of her location and isolation. He carried a stick which he could have used as a weapon. He preyed upon her past history to force her to accede to

his wishes even though she told him she was not working.  She was therefore particularly vulnerable within the meaning of California Rules of Court, rule 4.421(a)(3).

We conclude the trial court articulated valid factors to support its decision to impose consecutive sentences.  (*People v. King, supra,* 183 Cal.App.4th at pp. 1323-1324.)

*DISPOSITION*

The judgment is affirmed.


**WOODS, J.**

**We concur:**


**PERLUSS, P. J.**                                        **SEGAL, J.***

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.