Filed 11/8/22  P. v. Rodriguez CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B315335 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. PA092986 |
| DAVID ERNESTO RODRIGUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David Walgren, Judge.  Affirmed.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

# INTRODUCTION

When defendant David Rodriguez believed his wife was cheating on him with a neighbor, he partially decapitated her with a machete. Then, he broke down the neighbor's door and tried to kill him too. He was stopped when the neighbor's family intervened, but he injured the neighbor's wife and son in the process. On appeal, defendant contends that we should remand for resentencing of one of the assault counts under Senate Bill No. 567 (2021–2022 Reg. Sess.), which limits the court's use of aggravating factors to impose an upper-term sentence. We conclude, based on the undisputed evidence at trial, that the jury would unquestionably have found that the victim was unusually vulnerable when she was attacked because she was asleep in her home when the attack began. We therefore affirm.

## PROCEDURAL BACKGROUND

By information dated April 26, 2021, defendant was charged with one count of murder (Pen. Code,[1] § 187, subd. (a); count 1); one count of premeditated attempted murder (§ 664/187, subd. (a); count 2); two counts of assault with a deadly weapon (a machete) (§ 245, subd. (a)(1); counts 3–4); two counts of mayhem (§ 203; counts 5–6); and one count of first degree burglary (§ 459; count 7).[2] As to counts 1, 2, 5, and 6, the information alleged that defendant had personally used a

---

[1]     All undesignated statutory references are to the Penal Code.

[2]     On July 19, 2021, the information was amended by interlineation to correct the name of the victim in counts 4 and 6.

machete in the commission of the offense (§ 12022, subd. (b)(1)). As to counts 2, 3 and 4, the information alleged defendant personally inflicted great bodily injury during the commission of the offense (§ 12022.7, subd. (a)). As to count 7, the information alleged that a person other than an accomplice was present during the commission of the offense (§ 667.5, subd. (c)). Defendant pled not guilty and denied the allegations.

After several continuances due to the Covid-19 pandemic and a jury trial at which he did not testify, the jury found defendant guilty of counts 1–5 and 7 and found the related allegations true. The jury found defendant not guilty of mayhem under count 6.

The court sentenced defendant to an aggregate term of 46 years to life. For the indeterminate part of the sentence, the court sentenced defendant to 37 years to life. The court imposed 26 years to life for count 1—25 years to life for premeditated murder (§ 187, subd. (a)), plus one year for the weapon enhancement (§ 12022, subd. (b)(1)). The court imposed 11 years to life for count 2—a life term for attempted murder (§ 664/187, subd. (a)), plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)) and one year for the weapon enhancement (§ 12022, subd. (b)(1))—to run consecutively to count 1 and to each other.

The court imposed a consecutive nine-year term for the determinate sentence. The court selected count 3 as the base term and imposed seven years—the upper term of four years for the assault (§ 245, subd. (a)(1)) plus three years for the great bodily injury enhancement (§ 12022.7, subd. (a)). The court imposed two years for count 4—one-third the mid-term of three years for the assault plus one-third of the three-year term for the

3

great bodily injury enhancement—to run consecutively.  Finally, the court stayed counts 5 and 7 under section 654.

Defendant filed a timely notice of appeal.

## FACTUAL  BACKGROUND

Defendant and Karla Rodriguez were married for 16 years and had three children.  They lived in an apartment in Los Angeles.  Rosa and Javier Orellana lived in the same apartment complex; they also have three children.  Javier and defendant had known each other since they lived in El Salvador.

Defendant suspected Karla of having affairs with other men, including with Javier.  He told police that he had put up with Karla's behavior for years.  He believed Karla brought other men to the apartment for sex, and his youngest son was fathered by someone else.  Police found no evidence to support defendant's accusations of infidelity.  To the contrary, the investigation revealed "that Karla was a dedicated mother and wife to [defendant], that she never strayed or had any type of affair with anyone."

Nevertheless, starting in December 2018, defendant began accusing Javier of trying to take Karla away from him.  Javier had not been seeing Karla; he wouldn't even talk to her.  But defendant repeated the accusation a half-dozen separate times.  On one occasion, when defendant and Javier were driving separate cars, defendant honked at Javier and told him to pull over.  Defendant accused Javier of having Karla with him and demanded to search the car.  After a thorough search—including under the floor mats—defendant calmed down.  Another time, defendant called Javier and demanded to search his apartment for Karla.  Again, he searched everywhere.

4

Defendant told police he had repeatedly confronted Karla and asked her to tell him the truth about Javier and the other men she had been seeing, but she always denied his accusations. He had never caught her in the act, so he hid recorders and phones around the apartment to monitor her activities. All day long, Karla would say, "Come on over. Come on over. He's gone now." She and the other men mocked him. But when defendant presented her with the recordings, Karla got angry and said he was crazy. Defendant said she refused to admit what she was doing.

According to defendant, on June 21, 2019, he had been listening to the recordings of Karla speaking to the other men. So he went to his car and took a machete out of the trunk.[3] Then, he returned to the apartment and told Karla that if she didn't admit the affair, he would kill Javier. But Karla continued to deny it. According to defendant, she got angry, lunged at defendant, and tried to grab him by the throat.

At 1:22 a.m., Karla called 911. The 911 call was played for the jury and admitted into evidence. She said, "my husband is threatening me here. He's—he's saying that I have men and he wants to kill me . . . ." Karla could be heard screaming hysterically for help before the call went silent. Video footage from the apartment building showed Karla fleeing the apartment and running down the stairs to the courtyard. Defendant pursued her, holding the machete. When Karla reached the bottom of the stairs, she tripped and fell; defendant caught up and struck her with the machete multiple times, nearly severing

---

[3] The jury was shown surveillance footage of defendant retrieving the machete.

her head. The parties stipulated that Karla died from multiple sharp-force injuries to the neck.

After attacking Karla, defendant went upstairs and kicked down Javier's locked front door. Rosa and Javier were asleep on a pull-out sofa in the living room; their three children slept in the bedroom. Defendant later admitted that he went to the apartment to kill Javier. He rushed through the door and immediately attacked Javier with the machete, slashing Javier nine times across the face and body.

Rosa tried to defend Javier by grabbing defendant's hands, at which point he hit her with the machete as well. The cut to Rosa's head required 11 stitches and left a scar. At that point, the children emerged from the bedroom. Defendant was still on top of Javier, slashing at him with the machete, when the oldest son, Erick, intervened. Erick first tried to wrench the machete out of defendant's hands. When he was unsuccessful, Erick threw himself against defendant, knocking him off the bed, then grabbed defendant by the ankles and dragged him out of the apartment. Erick called 911 at 1:31 a.m., and the family waited for the police to arrive.

Javier was in agony. The skin on the right side of his face was hanging off. His arm was hanging, and his back was sliced up. He was bleeding profusely. Erick suffered permanent damage to four of his fingers, which required surgery.

Meanwhile, after Erick dragged him from the apartment, defendant went back to the courtyard and sat on a bench. He could see Karla lying on the ground and thought she might still be alive, but he did not try to help her.

The police arrived at the apartment building at 1:28 a.m. Two minutes later, at 1:30 a.m., they met defendant at the

6

building's locked front gate. Defendant let them in. He was covered in blood. When officers asked defendant what had happened, he replied, "I killed them." Defendant was placed under arrest.

Officers discovered Karla, dead, in the courtyard. Defendant then directed the officers to Javier, whom they located at 1:37 a.m. An 18-inch machete was recovered from the scene.

Defendant was advised of his constitutional rights and gave a lengthy statement to the police.[4] The recording was admitted into evidence and played for the jury.

When Javier woke up in the hospital, he could not remember anything about the attack. He could not feel his left hand or his face; he has since regained only partial feeling. Javier also lost his right eye—the socket is now filled with a plastic replacement—and suffered multiple scars to the arms and torso. Javier spent two weeks in the hospital. He continues to have difficulty breathing.

## DISCUSSION

Defendant contends this case must be remanded for resentencing because a recent change in the law has rendered unlawful his upper-term sentence for count 3, the assault on Rosa. The People properly concede the retroactivity of the amended statute but argue that resentencing is not required because there is undisputed evidence of the aggravating factors upon which the court relied. We agree with the People.

---

[4] Defendant did not challenge the admissibility of this statement either below or on appeal.

**1.** **Senate Bill No. 567 applies retroactively to defendant.**

In *Cunningham v. California* (2007) 549 U.S. 270 (*Cunningham*), the United States Supreme Court held that California's procedure for selecting upper-term sentences under the Determinate Sentencing Law, former section 1170, subdivision (b), violated criminal defendants' Sixth and Fourteenth Amendment rights to a jury trial because it gave "to the trial judge, not to the jury, authority to find the facts that expose a defendant to an elevated 'upper term' sentence." (*Cunningham*, *supra*, at p. 274.) The court explained that "the Federal Constitution's jury-trial guarantee proscribes a sentencing scheme that allows a judge to impose a sentence above the statutory maximum based on a fact, other than a prior conviction, not found by a jury or admitted by the defendant." (*Id.* at pp. 274–275.)

In response to *Cunningham*, the Legislature amended the Determinate Sentencing Law to eliminate the requirement of judicial fact-finding to impose a lower or upper term and to grant judges the discretion to select any term within the statutory range. (Stats. 2007, ch. 3, § 2.) Thus, when defendant was sentenced in this case, the trial court had broad discretion to decide which of the three terms specified for count 3 would best serve the interests of justice. (See § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14; Cal. Rules of Court, rule 4.420(e).) In making its selection, the court could consider the circumstances in aggravation or mitigation (as defined by rules 4.421 & 4.423) "and any other factor reasonably related to the sentencing decision." (Rule 4.420(d).)

Effective January 1, 2022, however, the Legislature amended the Determinate Sentencing Law again—this time to

make the middle term of imprisonment the presumptive sentence. (See § 1170, subd. (b)(2), as amended by Senate Bill No. 567 (2021–2022 Reg. Sess.), Stats. 2021, ch. 731, § 1.3.) Under the amended statute, the trial court may impose an upper-term sentence *only* where there are aggravating circumstances in the crime, and the defendant has either stipulated to the facts underlying those circumstances or the trier of fact has found them true beyond a reasonable doubt. (§ 1170, subds. (b)(1)–(2), as amended by Stats. 2021, ch. 731, § 1.3.)[5]

We "assume, absent evidence to the contrary, that the Legislature intended an 'amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date.' " (*People v. Lopez* (2019) 42 Cal.App.5th 337, 341.) "For the purpose of determining the retroactive application of an amendment to a criminal statute, the finality of a judgment is extended until the time has passed for petitioning for a writ of

---

[5] As amended, section 1170 provides that a trial court "may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense." (§ 1170, subd. (b)(2), added by Stats. 2021, ch. 731, § 1.3.)

certiorari in the United States Supreme Court." (*Id.* at pp. 341–342, citing *People v. Vieira* (2005) 35 Cal.4th 264, 305–306.)

The parties agree that the amendments to the Determinate Sentencing Law apply retroactively to defendant because his conviction was not final when the legislation took effect. (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.) The People argue, however, that remand is unnecessary because the error was harmless.

## 2. Remand is not required.

Error in relying on facts not found by the jury to impose an aggravated term is subject to review under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18, as applied in *Neder v. United States* (1999) 527 U.S. 1 and *Washington v. Recuenco* (2006) 548 U.S. 212. (*People v. Sandoval* (2007) 41 Cal.4th 825, 838.) *Sandoval*, addressing *Cunningham* error, instructed us to "determine whether, if the question of the existence of an aggravating circumstance or circumstances had been submitted to the jury, the jury's verdict would have authorized the upper term sentence." (*Sandoval*, at p. 838.)[6]

---

[6] There is a split of authority concerning whether we must *also* determine whether the trial court would have exercised its discretion to impose the upper term if it had been aware of the statutory presumption in favor of the middle term. (Compare *People v. Lopez* (2022) 78 Cal.App.5th 459, 463, 466–467, fns. 10 & 11 [so holding] with *People v. Flores*, *supra*, 75 Cal.App.5th at pp. 500–501 [where a defendant is entitled to retroactive application of Senate Bill No. 567, an upper term sentence may be affirmed as long as it can be determined, beyond a reasonable doubt, that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt.].) We need not,

"[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury, the Sixth Amendment error properly may be found harmless." (*Id*. at p. 839; see also *People v. Osband* (1996) 13 Cal.4th 622, 728 [a single aggravating factor is sufficient to support an upper term].)[7]

Here, the court explained the reasons for its sentencing decisions as follows:

"As far as factors in aggravation and mitigation that the court considered, pursuant to California Rules of Court 4.421(a), again, agreeing with the People, the crime involved great violence and great bodily harm. The defendant was armed with or used a deadly weapon, in this case, a machete. The victims were all particularly vulnerable.

_____

and do not, take a position on this question because our conclusion would be the same under either approach.

[7] There is also a split of authority concerning whether we must "conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*, because the amended statute requires that every factor on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury [Citation]." (*People v. Lopez, supra*, 78 Cal.App.5th at p. 466 & fn. 10.) Because, as discussed below, only one aggravating factor applies to the assault on Rosa, we need not, and do not, resolve that question.

11

"I would also add that I think the manner in which the crime was carried out did indicate planning and sophistication. And that is premised on the fact that the video revealed not only was the defendant armed with a machete, but he evidently went to retrieve it from his vehicle at least an hour prior to committing the murder.

"Factors relating [to] the defendant. I would note that this was a conceptually brutal and heinous, violent murder and attempt murder and assaults. As far as mitigation, the probation report notes no factors in mitigation. I disagree. And I would agree with the People, and the People concede one factor in mitigation is his lack of criminal record, at least as far as we are aware of here in the United States."

Defendant notes that the court did not specify which aggravating factors applied to which count and argues that most of the enumerated factors, if applied to count 3, would violate the dual-use prohibition, under which a "fact that is an element of the crime upon which punishment is imposed may not be used to impose a greater term." (Cal. Rules of Court, rule 4.420(h); see *People v. Scott* (1994) 9 Cal.4th 331, 350 [court may not "use a fact constituting an element of the offense either to aggravate or to enhance a sentence."]; *People v. Clark* (1992) 12 Cal.App.4th 663, 666 [a sentencing factor "is an element of the offense if the crime as defined by statute cannot be accomplished without performance of the acts which constitute such factor."].)

To be sure, assault with a deadly weapon (§ 245, subd. (a)(1)) cannot be accomplished without using a deadly weapon. As such, the court could not use that factor—"defendant was armed with or used a deadly weapon, in this case, a machete"—to impose the upper term in count 3. Likewise, the

12

court concluded that "the crime involved great violence and great bodily harm"—but that fact was the basis for the great-bodily-injury enhancement (§ 12022.7, subd. (a)) to count 3, and as such, could not be used as the basis to impose the upper term.  And although the court held that "the manner in which the crime was carried out did indicate planning and sophistication," there is no evidence in the record to support the conclusion that defendant set out to attack Rosa.  Instead, the evidence established that her assault occurred only because she was trying to stop defendant from killing her husband.

Nevertheless, as the People note, there is one enumerated factor that properly applies to count 3:  "The victims were all particularly vulnerable."  " 'As used in the context of rule 4.421(a)(3), a "particularly vulnerable" victim is one who is vulnerable "in a special or unusual degree, to an extent greater than in other cases.  Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act. . . ." [Citation.]' [Citation.]"  (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 558.)  In assessing vulnerability under rule 4.421, we consider the "total milieu in which the commission of the crime occurred," including both the personal characteristics of the victim and the setting of the crime.  (*People v. Price* (1984) 151 Cal.App.3d 803, 814.)

In this case, defendant did not dispute the facts of the charged crimes below and does not do so on appeal.  Nor does he dispute the general proposition that people are particularly vulnerable when they are asleep.  (*People v. Loudermilk* (1987) 195 Cal.App.3d 996, 1007; see also *People v. Hall* (1988) 199 Cal.App.3d 914, 922 [victims were particularly vulnerable because they were attacked in their own home].)  He contends,

however, that "it is not clear beyond a reasonable doubt that a jury or court would find Rosa, who was awake and fighting, as vulnerable in a 'special or to a[n] unusual degree, to an extent greater than in other cases.' [Citation.]" We disagree.

On the night of the attack, Rosa and Javier went to sleep on a pull-out sofa in the living room. Rosa slept on the left, hemmed in by the couch on one side and Javier on the other. She awoke at approximately 1:30 a.m., when defendant barged into the apartment with a machete. Defendant rushed through the door, swinging the machete, and attacked Javier within "a matter of seconds." Both Rosa and Javier were still in bed when defendant attacked, and Rosa was still in bed when she grabbed defendant in an effort to defend her husband. At that point, defendant hit Rosa with the machete as well. The entire attack—from the time defendant broke in until the time Erick dragged him from the apartment by the ankles—lasted 20–25 seconds. Taken together, the undisputed evidence established that Rosa was assaulted in her bed, less than a minute after being awakened by the beginning of defendant's assault. She had virtually no time to obtain anything to shield herself from the attack, or to escape the vulnerable position in which she found herself on the bed.

Rosa's testimony about the brevity of the attack is consistent with the timing of the surrounding events. Karla called 911 at 1:22 a.m. The first police officers arrived at 1:28 a.m. They met defendant at the building's front gate at 1:30 a.m. During that eight minutes, defendant chased Karla down the stairs, nearly decapitated her with a machete, headed back upstairs, broke down the door to Javier and Rosa's apartment, attacked Javier and Rosa, was tackled and dragged from the

14

apartment by Erick, and returned to the courtyard to sit on a bench and wait for the police to arrive.

We conclude beyond a reasonable doubt, that the jury, applying the beyond a reasonable doubt standard in this case, unquestionably would have found that Rosa was particularly vulnerable had that aggravating circumstance been submitted for it to decide.  (*People v. Sandoval, supra,* 41 Cal.4th at p. 839.)

## DISPOSITION

The judgment is affirmed.


HARUTUNIAN, J.*

We Concur:


STRATTON, P. J.


WILEY, J.

---

*       Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.