Filed 6/26/15  P. v. Choto CA6
Received for posting 8/26/15

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILIAN HERNANDO CHOTO,<br><br>    Defendant and Appellant. | H040943<br>(Santa Cruz County<br>Super. Ct. No. F25093) |

After the court denied defendant Wilian Hernando Choto's motion to suppress evidence obtained following a search of his person (Pen.Code, § 1538.5), defendant pleaded no contest to one count of possession for sale of heroin (Health & Saf. Code, § 11351).  The court sentenced defendant to two years in prison.  On appeal, defendant contends his motion to suppress evidence should have been granted because the detention and search of his person were unreasonable under the federal and California Constitutions.  (U.S. Const., 4th & 14th Amends, Cal Const., art I, § 13.)  We disagree and affirm the judgment.

*Standard of Review*

In ruling on a motion to suppress, the trial court is vested with the power to judge the credibility of witnesses, resolve conflicts in the testimony, weigh the evidence, and draw factual inferences.  (*People v. Lawler* (1973) 9 Cal.3d 156, 160, superseded by statute on another ground as stated in *People v. Trujillo* (1990) 217 Cal.App.3d 1219, 1223.)  Accordingly, we review the evidence in the light most favorable to the trial

court's ruling and accept its express and implied findings of fact if supported by substantial evidence. (*People v. Woods* (1999) 21 Cal.4th 668, 673.) It is the trial court that selects the applicable rule of law and applies it to the facts to determine the legality of police conduct, and both of these determinations are subject to our independent review. (*People v. Carter* (2005) 36 Cal.4th 1114, 1140; *People v. Alvarez* (1996) 14 Cal.4th 155, 182; *People v. Glaser* (1995) 11 Cal.4th 354, 362.) Our review is based on the evidence presented to the trial court at the suppression hearing, which we summarize below. (Cf., e.g., *People v. Marks* (2003) 31 Cal.4th 197, 219, fn. 3 [review of competency determination limited to evidence presented at competency hearing].) " ' Pursuant to article I, section 28, of the California Constitution, a trial court may exclude evidence under Penal Code section 1538.5 only if exclusion is mandated by the federal Constitution.' [Citation.]" (*People v. Robinson* (2010) 47 Cal.4th 1104, 1119.)

*Facts*

At approximately 11:00 p.m. on July 11, 2013, while on patrol on Soquel Drive in Aptos, Deputy Besk of the Santa Cruz County Sheriff's Office saw a black BMW parked in the rear parking lot of a strip mall. At that hour all the businesses were closed; however, the parking lot was illuminated in places. In March 2013, Deputy Besk had observed drug sales in this particular parking lot. Deputy Besk decided to approach the BMW to see what was going on. The parking lot had parking spots on either side of a center lane where cars could go in either direction. The BMW was parked in a parking spot on one side of the lot; Deputy Besk parked his patrol car in a parking spot on the opposite side of the lot. Deputy Besk got out of his partrol car and walked toward the BMW. Before leaving his patrol vehicle, Deputy Besk contacted dispatch and gave them the registration number of the BMW as a safety precaution.

As Deputy Besk walked to the BMW, he noticed an ice cream cup on the roof of the car. He heard the BMW's engine turn on and had to step out of the way as the car backed out of the parking spot. The BMW stopped and the front seat passenger stepped

2

out and retrieved the ice cream cup.[1]  Before the passenger reentered the BMW Deputy Besk greeted her and asked what she was doing there.  While talking to the passenger, Deputy Besk saw that she had some objective symptoms of controlled substance use—pale clammy skin, constricted pupils, and blood shot and watery eyes—plus she was animated and spoke very quickly.  Deputy Besk saw that the passenger's lips were chapped and her mouth dry.  She appeared unkempt.

The passenger got back into the BMW.  Deputy Besk asked her if she could roll down the car window.  The driver of the BMW said the passenger side window was broken and rolled down her window instead.[2]  Deputy Besk walked around the car and talked to the driver through the open window.[3]  Again, he noticed the driver displayed objective symptoms of controlled substance use—yellowish skin tone, dark rings under her eyes, bloodshot watery eyes, constricted pupils, and nervousness, and she was "shaking pretty heavily."  While speaking with the driver, Deputy Besk noticed someone in the back seat of the BMW.  This person, identified as the defendant, was wearing a flat-billed hat and lowered his head so the bill of the hat obscured his face; Deputy Besk testified that at that point he "just wanted to know who he was."

Deputy Besk asked the two women the name of the person in the back seat and they said his name was Orlando, but they did not know his last name.  Deputy Besk asked if the back window rolled down and the driver said yes and rolled it down.  Deputy Besk "greeted" defendant and said that he thought he recognized him.  Defendant said that the officer did not know him.  Deputy Besk asked defendant his name and defendant told him

[1] This passenger was identified as Stephanie Kelly.
[2] The driver was identified as Claire Abot.
[3] During the time that Deputy Besk was walking over to talk to the BMW's driver, a second deputy arrived.  Deputy Nunes parked his patrol car to the rear of and perpendicular to the BMW between the BMW and the Soquel Avenue exit of the parking lot.  While Deputy Besk was talking to the BMW's driver, he heard Deputy Nunes, who was on the passenger side of the BMW, say "Would you mind taking your hands out of your pockets."

that it was Orlando Lopez. Again, the deputy saw that defendant displayed objective symptoms of being under the influence of a controlled substance—his voice was low and raspy consistent with opiate use, his pupils were constricted and his eyes were watery and bloodshot, his skin was greasy and clammy, his eyelids were drooping and relaxed, and his whole demeanor was very relaxed, consistent with opiate use.

Deputy Besk testified that he obtained the names of the three people in the BMW and contacted dispatch to request a records' check. Defendant had given Deputy Besk a "couple of different dates" when asked by the deputy for his date of birth.[4] Deputy Besk had asked defendant if he had any identification on him and defendant told him that he did not and that he had not been issued a driver's license or state-issued identification card. The deputy asked defendant if he was on probation and defendant told him that he was not. The deputy thought that defendant was lying to him about his name and date of birth. Deputy Besk asked defendant if he had any tattoos and defendant told him he did not.

After Deputy Nunes told Deputy Besk to detain defendant for failing to follow instructions to show his hands, Deputy Besk asked defendant to get out of the car. Defendant did not get out of the car so Deputy Besk opened the car door and told him to get out. As he did so, Deputy Besk saw a white-handled knife on the floorboard near defendant. Deputy Besk asked defendant about the knife and the defendant told him it was his; defendant began reaching for the knife. Deputy Besk told defendant to stop reaching for the knife, defendant complied. Defendant got out of the car. According to Deputy Besk, based on seeing the knife, he pat-searched defendant for additional weapons. The deputy testified that defendant was wearing loose clothing and he was not able to see his pocket area or his belt line. Before pat-searching defendant, Deputy Besk

---

[4] Deputy Besk testified that defendant "told [him] a couple of different dates, and then ultimately . . . got hung up on the year that he was born, between '85 and '95."

felt defendant tense up and try to pull his fingers away from the grip he had on him. Accordingly, Deputy Besk placed defendant in handcuffs "for officer safety."

As Deputy Besk was pat-searching defendant he felt a wallet in his back pocket. The deputy asked defendant if it was his wallet; defendant confirmed that it was. Then the deputy asked if there was any identification inside; defendant told him there was not. Deputy Besk removed the wallet and looked inside where he found an identification card with defendant's real name. On cross-examination, Deputy Besk confirmed that defendant was not under arrest at the time he searched him and that he was conducting a "*Terry* search[.]"[5]

The proceedings at the suppression hearing focused on what led up to the search and did not address what occurred after a record check on the name Wilian Hernando Choto. From preliminary hearing testimony it appears that once Deputy Besk ran a record check on that name he discovered that the person had a tattoo. As Deputy Besk un-tucked defendant's shirt to examine his body for tattoos, a plastic bag containing a substance, which was later confirmed to be heroin, fell to the ground. The heroin weighed 10.6 grams.

At the suppression hearing, the court took judicial notice of the fact that defendant was placed on probation in two different cases and was ordered to submit to search and seizure for illegal controlled substances.

At the end of the suppression hearing, defense counsel argued that Deputy Besk did not have a reasonable suspicion for an investigatory stop and even if he did it was unreasonably prolonged and the officer engaged in a "fishing expedition." Defense counsel asserted that defendant had a right to privacy in his wallet and the discovery of the wallet was "completely outside the bounds of the *Terry* frisk." Defense counsel argued that the officer should not have taken the wallet or searched it; and all the

---

[5] *Terry v. Ohio* (1968) 392 U.S. 1, 22 (*Terry*).

5

evidence that "flowed out of this case came because of the search of the wallet . . . ."

The court found that Deputy Besk's conduct "was reasonable, that he believed Mr. Choto was committing at least one crime when he conducted the pat-down. [¶] There was [*sic*] some officer safety concerns, based on the knife and the conduct: the defendant not cooperating, putting his hands in his pocket, not showing his hands, that sort of thing. [¶] And the identification was obtained from the wallet after the defendant indicated he didn't have any identification." Relying on *People v. Watkins* (2009) 170 Cal.App.4th 1403, the court held that defendant should not be "able to benefit from lying to the officer regarding having search terms." Accordingly, the court denied the motion to suppress.

*Discussion*

Defendant contends that his detention preceded any grounds to suspect that he had engaged in criminal conduct; the pat search was unjustified because, handcuffed and under the control of two armed officers, he posed no objectively reasonable danger to officer safety and the warrantless search into his pocket, seizure of his wallet, and search through his wallet exceeded the scope of a valid *Terry* stop.

We address each of defendant's contentions in turn. Initially, however, we make the following observations.

Repeatedly, it has been held that the fact that a detainee happens to be in a high-crime neighborhood is, of itself, insufficient to support a reasonable suspicion for a peace officer to stop that person. (*In re Tony C.* (1978) 21 Cal.3d 888, 897, superseded by statue on other grounds as stated in *In re Christopher B.* (1990) 219 Cal.App.3d 455, 460, fn.2.;[6] *People v. Pitts* (2004) 117 Cal.App.4th 881, 887; *People v. Medina* (2003)

---

[6] "Since the passage of Proposition 8 in 1982 (Cal. Const., art. I, § 28), the subjective belief of the citizen set out in *In re Tony C.* (1978) 21 Cal.3d 888, no longer applies in analyzing whether an encounter is a detention. [Citation.] Rather the federal standard of analyzing the objective facts of the incident controls. [Citation.]" (*In re Christopher B.*, *supra*, 219 Cal.App.3d at p. 460, fn. 2.)

110 Cal.App.4th 171, 177.)  As our high court has explained, "The 'high crime area' factor is not an 'activity' of an individual.  Many citizens of this state are forced to live in areas that have 'high crime' rates or they come to these areas to shop, work, play, transact business, or visit relatives or friends.  The spectrum of legitimate human behavior occurs every day in so-called high crime areas.  As a result, this court has appraised this factor with caution and has been reluctant to conclude that a location's crime rate transforms otherwise innocent-appearing circumstances into circumstances justifying the seizure of an individual.  [Citations.]" (*People v. Bower* (1979) 24 Cal.3d 638, 645, superseded by statute on other grounds, as stated in *People v. Lloyd* (1992) 4 Cal.App.4th 724, 733; see also *People v. Loewen* (1983) 35 Cal.3d 117, 124.)

Moreover, the California Supreme Court has observed that "an individual is free to avoid contact with a police officer . . . '[t]o hold that the mere exercise of this liberty justifies a detention would be tantamount to holding that an officer may insist upon an encounter without adequate cause.' [Citation.]" (*People v. Souza* (1994) 9 Cal.4th 224, 234; see also *People v. Bower*, *supra*, 24 Cal.3d at p. 648, [an individual, unless he or she is properly detained and so notified, is as free to avoid the officer as to avoid any other person].)  Similarly, the United States Supreme Court has held that a person approached by police for questioning "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way.  [Citations.]  He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." (*Florida v. Royer* (1983) 460 U.S. 491, 498.)

*Detention*

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him [or her] if he [or she] is willing to answer some questions, by putting questions to him [or her] if the person is willing to listen . . . .  [Citations.]" (*Florida v. Royer*, *supra*, 460 U.S. at

7

pp. 497-498; see also *People v. Bower*, *supra*, 24 Cal.3d at p. 648; see also *People v. Hughes* (2002) 27 Cal.4th 287, 328.)

"Police contacts with individuals may be placed into three broad categories ranging from the least to the most intrusive: consensual encounters that result in no restraint of liberty whatsoever; detentions, which are seizures of an individual that are strictly limited in duration, scope, and purpose; and formal arrests or comparable restraints on an individual's liberty. [Citations.]" (*In re Manuel G.* (1997) 16 Cal.4th 805, 821.)

"Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' . . . and not on the officer's actual state of mind at the time the challenged action was taken." (*Maryland v. Macon* (1985) 472 U.S. 463, 470-471, quoting *Scott v. United States* (1978) 436 U.S. 128, 136, 138, 139 fn.13.)

A temporary detention for questioning or investigation may be justified by circumstances falling short of the probable cause needed for an arrest. (*Terry*, *supra*, 392 U.S. at p. 22.) To justify such a detention, an officer need only have a reasonable suspicion of criminal activity; more specifically," 'the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience [citation], to suspect the same criminal activity and the same involvement by the person in question.' " (*People v. Loewen*, *supra*, 35 Cal.3d at p. 123.) Since the officer's subjective suspicion must be objectively reasonable, " 'an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete

8

good faith. [Citation.]' [Citation.] But where a reasonable suspicion of criminal activity exists, 'the public rightfully expects a police officer to inquire into such circumstances "in the proper exercise of the officer's duties." [Citation.]' [Citation.]" (*People v. Wells* (2006) 38 Cal.4th 1078, 1083.)

In contrast to a temporary detention, a consensual encounter does not require any justification and does not trigger Fourth Amendment scrutiny because it is not a seizure or a constitutionally cognizable restraint on a person's liberty. "Only when the officer, by means of physical force or show of authority, in some manner restrains the individual's liberty, does a seizure occur." (*In re Manuel G.*, *supra*, 16 Cal.4th at p. 821.) Conversely, "[a]s long as a reasonable person would feel free to disregard the police and go about his or her business, the encounter is consensual and no reasonable suspicion is required on the part of the officer." (*Ibid.*; *Florida v. Bostick* (1991) 501 U.S. 429, 434.)

"The guiding principle in determining the propriety of an investigatory detention is 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.' [Citations.] In making our determination, we examine 'the totality of the circumstances' in each case. [Citations.]" (*People v. Wells*, *supra*, 38 Cal.4th at p. 1083.)

Deputy Besk had the right to approach the car in which defendant was a passenger—as he would with any other group of citizens—and to inquire if the occupants of the car were willing to answer some questions. Although the deputy had the right to seek the voluntary cooperation of the occupants, absent a reasonable suspicion that they were involved in criminal activity, he could not compel that cooperation by detaining them.

Once the driver of the BMW stopped backing out of the parking spot and the front seat passenger stepped out and retrieved the ice cream cup, Deputy Besk noticed that she displayed objective symptoms of being under the influence of a controlled substance. Accordingly, a reasonable suspicion of criminal activity existed for a detention of the

9

front seat passenger. After the passenger got back into the BMW, Deputy Besk asked if the passenger could roll down the window. Deputy Besk was alone and did not force the BMW to stop or pull his gun such that a reasonable person would have felt that he or she was not free to leave. Voluntarily, the driver rolled down the driver's side window, at which point Deputy Besk walked over and spoke to her. Again, he noticed that she was displaying objective symptoms of being under the influence of a controlled substance. Accordingly, a reasonable suspicion of criminal activity existed for a detention of the driver. Being under the influence of a controlled substance is a criminal offense. (Health & Saf. Code, § 11550, subd. (a).) Deputy Besk's opinions were based on his training in recognizing objective symptoms of being under the influence of a controlled substance and his experience being on the narcotics enforcement team for three years during which time he evaluated in excess of 200 people for being under the influence of narcotics. " '[C]ircumstances and conduct [that] would not excite the suspicion of the man on the street might be highly significant to an officer who had had extensive training and experience.' " (*In re Frank V*. (1991) 233 Cal.App.3d 1232, 1240-1241.)

In *Brendlin v. California* (2007) 551 U.S. 249, the United States Supreme Court held that for the duration of a traffic stop, the police officer effectively seizes everyone in the vehicle, the driver and all passengers. (*Id*. at p. 255.) In a traffic stop setting, an officer lawfully detains the driver and all passengers pending inquiry into the vehicular violation. (*Id*. at p. 263.) In this case, Deputy Besk could lawfully detain the car and its occupants because he reasonably suspected that the driver was under the influence of a controlled substance. Driving under the influence of a controlled substance is a criminal offense. (Veh. Code, § 23152, subd. (e).) Since defendant was a passenger in a car that was lawfully detained, he too was lawfully detained.

Moreover, even if officers have no basis for suspecting an individual of a crime, they may generally ask questions, ask for identification, and ask for consent to search. (*People v. Brown* (1998) 62 Cal.App.4th 493, 499.)

In *Maryland v. Wilson* (1997) 519 U.S. 408, the United States Supreme Court held that officers lawfully may ask passengers to exit the vehicle during a traffic stop without violating the Fourth Amendment. (*Maryland v. Wilson*, *supra*, 62 Cal.App.4th at p. 415.) Once a passenger has been asked to get out of a vehicle during a traffic stop, an officer may lawfully conduct a pat-down for weapons to protect officer safety if the officer reasonably concludes the person might be armed and presently dangerous. (*Id.* at pp. 414-415; *Arizona v. Johnson* (2009) 555 U.S. 323, 331-332, [pat-down of occupants of vehicle in a traffic stop permissible if based on reasonable suspicion that they may be armed and dangerous].)

When Deputy Besk asked defendant to get out of the BMW, he noticed the white-handled knife on the floorboard close to defendant; defendant started to reach for the knife. Although defendant complied with Deputy Besk's command to stop reaching for the knife, Deputy Besk was justified in pat-searching defendant for other weapons. The Supreme Court has permitted limited intrusions on a suspect's liberty during a *Terry* stop to protect the officer's safety; a police officer may take reasonable measures to neutralize the risk of physical harm and to determine whether the person in question is armed. (*United States v. Hensley* (1985) 469 U.S. 221, 235; *Terry*, *supra*, 392 U.S. at p. 24.)

Officer Besk acted reasonably in removing defendant from the BMW and handcuffing him while he pat-searched him to make sure that he was not carrying any other weapons. (Cf. *People v. Osbourne* (2009) 175 Cal.App.4th 1052, 1062 [officer acted reasonably in handcuffing nervous defendant who tensed up as if attempting to remove hand from officer's grasp which caused officer to fear that defendant, who was larger than officer, might be able to break free and assault officer].)

*Scope of the Pat Search*

Given the presence of the knife in the BMW and defendant's attempt to pull his hands away from Deputy Besk, the decision to frisk defendant in handcuffs for further

11

weapons was justified. That being said, we must determine if Deputy Besk exceeded the scope of the pat search by reaching into defendant's pocket and removing and then searching defendant's wallet for identification.

The rules for determining the legality of a pat search are well settled. It is worth repeating that when an officer has a reasonable belief that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, the officer has the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. (*Terry*, *supra*, 392 U.S. at p. 24.) Nevertheless, "[t]he sole justification of the search . . . is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." (*Id.* at p. 29.) In general, if a pat search demonstrates that the objects found on a suspect's person are not weapons or contraband, the search ends and the objects may not be seized. (*People v. Dickey* (1994) 21 Cal.App.4th 952, 956-957.)

Even if the officer had reasonable grounds to stop and detain appellant under *Terry*, we must determine whether Deputy Besk was justified in removing defendant's wallet in search of his identification. In *People v. Garcia* (2006) 145 Cal.App.4th 782, 784-788 (*Garcia*), our colleagues in Division Six of the Court of Appeal, Second Appellate District held that *Terry* does not justify a search for ordinary evidence, including identification. They stated: "A fair reading of *Terry v. Ohio*, and its reference to the lower court opinion in *State v. Terry* (1966) 5 Ohio App.2d 122, show that the 'frisk' allowable upon a proper showing was ' "only a 'frisk' for a dangerous weapon. It by no means authorizes a search for contraband, evidentiary material, or anything else in the absence of reasonable grounds to arrest. Such a search is controlled by requirements of the Fourth Amendment, and probable cause is essential." ' [Citation.] Our own Supreme Court has unanimously so held. (*People v. Lawler* (1973) 9 Cal.3d 156, 161

12

[pat-down search only for weapons].) If stare decisis means anything (and it does) and if the word 'only' means 'only'(and it does), the trial court was required to grant this suppression motion as a matter of law. [Citation.]" (*Garcia*, *supra*, at p. 788.) The *Garcia* court then concluded its discussion of this issue by expressly stating, "[T]here is no legal justification for a patdown search for identification." (*Ibid.*)

In *Garcia*, the defendant was riding a bicycle without an operative headlamp. An officer lawfully detained him for violating Vehicle Code section 21201, subdivision (d), and requested his identification. Garcia, who spoke limited English, said that he had no identification. *He did not provide a false name and birth date*. The officer then started to pat down Garcia, and used force to restrain him when he pulled away. He continued the search and located incriminating evidence. Under those circumstances, the *Garcia* court concluded that the search was unlawful. (*Garcia*, *supra*, 145 Cal.App.4th at pp. 784-785, 789.)

Defendant's situation is more akin to that of the defendant in *People v. Loudermilk* (1987) 195 Cal.App.3d 996 (*Loudermilk*), where the court upheld the seizure of a wallet. In *Loudermilk*, officers stopped a hitchhiking defendant who matched the description of a person suspected of committing a firearm assault. The officers asked the defendant to produce identification and the defendant responded that he did not have any. One of the officers then performed a pat-down search for weapons and felt what appeared to be a wallet in the defendant's rear pocket. The officer reached in, removed the wallet, opened it, and began searching for identification. (*Id.* at p. 1000.) Noting that the right to inquire into a suspect's identity is necessary for an effective investigatory detention, the court stated that "[t]o require defendant . . . to display his driver's license or other proof of identification is a minor intrusion which is strictly limited to the sole justification of the detention." (*Id.* at p. 1002.) "[T]he *Terry* suspect may not lie to the officer with impunity about his identity if there is a quick and minimally intrusive method of resolving the doubt." (*Ibid.*) The court concluded that the seizure of the defendant's

13

wallet was reasonably related to the purpose and scope of the investigative detention and that the officer was not conducting a general " 'fishing expedition' " for whatever evidence he could find, but merely seeking to ascertain the defendant's identity. (*Ibid.*) Where the defendant had "lied to the officer and himself created the confusion as to his own identity[,] [t]he seizure of [his] wallet was minimal and strictly limited to the legitimate inquiry into his identity." (*Id.* at p. 1004.)

Nevertheless, the *Loudermilk* court observed: "We must emphasize that we do *not* hold that a suspect may be detained and searched merely because he either refused to identify himself or refused to produce proof of identification. Nor do we hold that each time an officer conducts a *Terry* stop he may immediately conduct a search for identification. The rule we announced does not provide officers with unfettered discretion and does not open citizens to harassment. Our decision, allowing the officer to seize the wallet, is limited *to the unique facts of this case*, where defendant lied to the officer and himself created the confusion as to his own identity. The seizure of defendant's wallet was minimal and strictly limited to the legitimate inquiry into his identity. We conclude that the seizure of defendant's wallet was reasonable within the meaning of the Fourth Amendment." (*Loudermilk*, *supra*, at p. 1004, second italics added.)

*Loudermilk* adopted the analysis set forth in *State v. Flynn* (1979) 92 Wis.2d 427, (*Flynn*). In *Flynn*, the Supreme Court of Wisconsin balanced the need for an identification search against the invasion of personal rights and concluded a limited search to find that a suspect's identification was reasonable and constitutional if the suspect refused to identify himself. (*State v. Flynn*, *supra*, 92 Wis.2d at pp. 448-449. The New Jersey Superior Court in *State v. Wilcox* (1981) 180 N.J. Super. 452 (*Wilcox*) followed *Flynn* and held an identification search incident to a detention was proper when the officer disbelieved a detainee's oral identification and the detainee produced a false identification from his wallet. (*Id.* at p. 457.) We find *Loudermilk*, *Flynn*, and *Wilcox*

14

persuasive under the facts of this case and conclude that the limited search for defendant's proper identification was reasonable within the meaning of the Fourth Amendment since defendant lied to the officer and could not or would not give the officer a correct date of birth.[7] This is not a case such as in *Garcia* where the sole reason for the pat down was to gather evidence of identification. (*Garcia*, *supra*, 145 Cal.App.4th at p. 785, 787.)

Here the extent of the pat-down search was not inconsistent with *Terry*. An officer may seize nonthreatening contraband that is detected during a pat-down search. (*Minnesota v. Dickerson* (1993) 508 U.S. 366, 373-374.) The contraband may be detected either because it is in plain view or because the officer detected it by touch. (*Id.* at pp. 375-376.) "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." (*Ibid.*) The same can be said of something that is not contraband, but can help clear up any confusion in a situation such as is present in this case. Here, Deputy Besk detected defendant's wallet during a legitimate pat-down search for weapons at a time when Deputy Besk reasonably believed that defendant was committing or had committed a crime. Given

---

[7] The People suggest that the search was a lawful incident to an arrest. "It is axiomatic that an incident search may not precede an arrest and serve as part of its justification." (*Sibron v. New York* (1968) 392 U.S. 40, 63.) Defendant was not arrested for anything until after the heroin was found. Alternatively, the People suggest that the search can be justified as a probation search. "A search pursuant to a parole or probation search condition is normally valid only if the officer knew of the condition when he did the search. [Citations.] This is so because 'the reasonableness of a search must be determined from the circumstances known to the officer when the search was conducted[,] consistent with the primary purpose of the exclusionary rule—to deter police misconduct.' [Citation.]" (*People v. Watkins*, *supra*, 170 Cal.App.4th at p. 1409.) At the time of the search, Deputy Besk did not know that defendant was on probation.

15

that defendant had difficulty remembering his date of birth, Deputy Besk reasonably suspected that defendant was trying to conceal his real identity.[8]  Thus, we believe that it was reasonable for the officer to check the defendant's identification in his wallet during the lawful *Terry* stop and frisk.  (*See United States v. Hernandez–Rivas* (7th Cir. 2003) 348 F.3d 595, 599; *United States v. Brown* (7th Cir. 2004) 366 F.3d 456, 461.)

We stress, however, that our holding is very narrow and limited to a situation where the officer, while conducting a lawful *Terry* frisk for weapons, reasonably believes that the suspect is not being candid about his or her identity.

Accordingly, we conclude that the lower court did not err in denying defendant's motion to suppress.

*Disposition*

The judgment is affirmed.

---

[8] We are mindful that California law prohibits a person who has been lawfully detained by law enforcement from giving a false name or otherwise falsely identifying himself or herself to the law enforcement officer.  (Pen. Code, § 148.9)

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.


_____

PREMO, J.