*See Concurring Opinion*

Filed 3/2/23

# CERTIFIED FOR PARTIAL PUBLICATION*[1]

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076449 |
| v. | (Super. Ct. No. FSB18002088) |
| BRANDON EDWARD LEWIS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. J. David Mazurek, Judge. Affirmed in part, vacated in part, and remanded.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Warren J. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

---

[1] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of sections III.A and III.B.

# I.

## INTRODUCTION

Defendant and appellant Brandon Lewis was sentenced to over 73 years in prison after a jury convicted him of various offenses associated with his pimping three victims who were minors. Defendant contends his Sixth Amendment right to confront an accuser was violated because a computer monitor blocked his view of her face when she testified. We disagree. Defendant also contends, the People concede, and we agree that a portion of his sentence was unauthorized. We therefore strike that portion of his sentence. Finally, defendant argues the case must be remanded for resentencing in light of recently enacted legislation. We agree, vacate his sentence, and remand for resentencing. In all other respects, the judgment is affirmed.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.W. met defendant in Las Vegas when she was 17 years old. She was homeless at the time and defendant offered her a place to stay so long as she helped him make money. After living with defendant for about two weeks, A.W. began prostituting herself for defendant. A.W. eventually moved in with defendant's girlfriend, T.W., who was also one of defendant's "girls."

During a "date," a customer began choking T.W., so A.W. physically assaulted him. The customer reported T.W., A.W., and defendant to the police, stating that they

2

held him against his will. The three of them fled Las Vegas for San Bernardino, where A.W. and T.W. continued prostituting themselves for defendant.

In the ensuing months, defendant became increasingly violent toward A.W. and T.W. He also became increasing controlling of A.W. If A.W. did not do as she was told, defendant used or threatened to use violence. On several occasions, defendant threatened and hit A.W. with a gun. He repeatedly beat both A.W. and T.W. in front of one another. He beat A.W. so severely on one occasion that she had to go to the hospital, where defendant instructed her to lie about what happened. Not long afterwards, defendant again beat A.W. so badly that she vomited and had to go to the hospital. She told the police at the hospital that defendant caused her injuries and she was taken to a women's shelter. A.W. later moved back in with defendant.

In April 2018, defendant unexpectedly showed up where A.W. was eating and told her to get in his car. Once she was inside the car, defendant hit her and drove off. Defendant drove around for over 90 minutes and refused to let A.W. get out of the car. During that time, defendant poured alcohol on her, punched her in the face at least 15 times, hit her in the face with his gun, told her she was "just a slave," and threatened to shoot and kill her.

Defendant eventually stopped in a dark area near a ditch and told A.W. to get out. He told A.W. he was going to shoot her and leave her in the ditch, while kicking her repeatedly as she lay on the ground. After he ordered her back in the car, he told her he and his friends were going to gang rape her. While they were stopped at a red light, A.W.

jumped out of the car and ran and hid behind a house. The next day, A.W. reported defendant's abuse to law enforcement while at the hospital. A.W. moved back in with defendant, but eventually left and returned to Las Vegas.

Jane Doe moved from San Bernardino into defendant's Las Vegas apartment when she was 16 years old, thinking that they were boyfriend and girlfriend. Within a few days, however, she realized defendant was planning on pimping her out as a prostitute.

About a year later, Jane Doe began prostituting herself for defendant in San Bernardino. Jane Doe ended up working for defendant every day for two or three years. As with A.W., defendant threatened Jane Doe with violence if she did not do what she was told.

Defendant was arrested and charged with various pimping-related offenses against T.W., A.W., and Jane Doe. A jury convicted him of human trafficking of A.W. to commit another crime (Pen. Code, §§ 236.1, subd. (b), 266h; count 1)[2], pimping of A.W. (§ 266h; count 2), two counts of pandering by procuring prostitution by A.W. and T.W. (§ 266i, subd. (a)(1); counts 3 & 7), kidnapping of A.W. (§ 207, subd. (a); count 4), assault with a firearm against A.W. (§ 245, subd. (a)(2); count 5), criminal threats against A.W. (§ 422, subd. (a); count 6), human trafficking of Jane Doe, a minor (§§ 236.1, subd. (c)(1), 266h; count 8), and pandering by procuring prostitution by Jane Doe, a minor (§ 266i, subd. (b)(1); count 9).

---

[2]  Unless otherwise indicated, all further statutory references are to the Penal Code.

The jury also found true allegations that defendant caused great bodily injury to A.W. in the commission of count 1 (§ 236.4, subd. (b)), and that he personally used a firearm in the commission of counts 1, 5, and 6 (§ 12022.5, subd. (a)). The trial court also found true a prior strike allegation (§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)). Defendant was sentenced to 73 years, four months in prison.

III.

DISCUSSION

A. *Sixth Amendment*

Defendant argues his convictions on counts 1 through 7 must be reversed because he could not see A.W.'s face while she testified, which he claims violated his Sixth Amendment right to confront an accuser. We disagree.[3]

1. *Background*

Shortly after A.W. took the stand to testify on the first day of trial, defense counsel asked for a sidebar. During the sidebar, defense counsel told the trial court, "I can't see her [A.W.] at all and I'm not sure exactly whether I move or what." The court told defense counsel, "you can move over so you can see her." "We can move him over a little further and you can move over a little bit . . . to the left. I'm not gonna put her in a position where she gets stared down. I'm gonna keep an eye on people in the audience. But I think he needs to at least be able to see her." Defense counsel and the court then briefly discussed counsel's concern that there were police officers "with their vests on" in

---

[3] At oral argument, defendant's counsel did not challenge our tentative opinion on this issue.

5

the courtroom. The court explained that he could see everyone in the courtroom and that everyone had behaved appropriately.

Defense counsel replied, "And if you can just say something. I'll push my client over so – just so I can see her." The trial court then asked a courtroom employee to ask A.W. to "slide over a couple of inches" so that defense counsel "can see her." The bailiff explained, "I think I can just move this monitor here," to which the court said, "[Defense counsel] can't see. I want [defense counsel] to be able to see." Defense counsel thanked the court and the trial proceeded with A.W. testifying for the rest of the day without any objection about defendant or his counsel not being able to see A.W.

The next day of trial began with A.W. testifying. Before she started testifying, however, defense counsel objected that he could not see her when she previously testified. Counsel explained: "[A.W.] sort of sat behind a screen that is up on the witness stand. And it was – I assume it was done so that she wouldn't have to look at my client or see my client. And I approached a couple times unfortunately in front of the jury. But I did approach a couple times just to try to address it because I couldn't see her on several occasions. [¶] I would ask that we take the computer down so that my client can see her and she can see my client. I do believe under the Sixth Amendment he has a right to see her. I would certainly ask to see her. I would note for the record that we had a couple sessions on Tuesday I believe. And I didn't see her. So I physically got up and sat in the District Attorney's seat for several portions of that witness' testimony sitting in between Detective Hernandez and the jury just so that I could see her. [¶] I don't believe that

6

there have been any allegations of threats that -- I think the one issue on the bus that we had had to do with a different witness which is [redacted] I believe.  And so that would be the request, that we remove that and that both my client and myself be able to see her."

The trial court ruled as follows:  "So it is the Court's ruling that counsel will be able to see her.  We will fix the screen so counsel can see her from where you are.  I don't necessarily -- for the witness' comfort, given the nature of the offenses alleged, given the nature of the defendant's demeanor, her ability to testify and provide information and provide candid information the Court thinks was helped by her not looking directly at the defendant.  There are many situations in which witnesses can be screened off entirely or testify via remote television.  The defendant's right to confront and cross-examine witnesses is for counsel.  So if counsel can see her, she does not have to look at the defendant given what the Court has seen as far as her testimony, how she started off speaking very softly and hesitantly.  And once she realized that -- once she got more comfortable, she became firmer in her testimony.  We were better able to hear her. [¶]  So I think I am going to just keep it the same way for now because I think it is important that we all hear what she has to say.  So we will make sure that counsel can see her.  And that will be the Court's ruling."  A.W. then testified.

2. *Forfeiture*

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  This provision

7

"guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact."  (*Coy v. Iowa* (1988) 487 U.S. 1012, 1016.)  This guarantee, however, is not absolute and may yield to important policy concerns so long as the witness's reliability remains assured.  (See *People v. Arredondo* (2019) 8 Cal.5th 694, 700-701, citing *Maryland v. Craig* (1990) 497 U.S. 836, 840 (*Craig*).)  A defendant may also forfeit the constitutional right to confront a witness by failing to object.  (*People v. Arredondo*, *supra*, at p. 710 ["We have applied this rule numerous times to find forfeiture of a constitutional right of confrontation claim."].)

Although defense counsel stated that *he* could not see A.W.'s face and objected on that basis before A.W. began testifying on the first day of trial, defense counsel never objected during the first day of A.W.'s testimony on the ground that *defendant* could not see A.W.'s face.  It was not until the beginning of A.W.'s second day of testifying that defense counsel objected on the ground that defendant could not see A.W.'s face.  By failing to object until the second day of A.W.'s testimony, defendant forfeited his objection that his inability to see A.W.'s face while she testified on the first day of trial violated the Confrontation Clause.

Defendant claims his failure to object should be excused because any objection would have been futile given that the trial court overruled his objection before A.W. testified on the second day of trial.  We disagree.  Our Supreme Court has "never expanded the futility exception to encompass a situation where, as here, the defendant made a belated objection after forgoing multiple earlier opportunities to object."  (*People*

8

*v. Bonilla* (2007) 41 Cal.4th 313, 336.)  Like that court, "we decline to do so here." (*Ibid.*)

Regardless, we cannot determine on this record whether an objection before A.W. began testifying on the first day of trial would have been futile.  The trial court overruled defendant's objection before she began testifying on the second day of trial in part because of what the court observed during A.W.'s testimony on the first day of trial.  According to the trial court, A.W. "started off speaking very softly and hesitantly," but "became firmer in her testimony" as she grew "more comfortable" on the stand.  In the court's view, this was because A.W. realized she did not have to look at defendant as she testified.  It is thus unclear how the trial court would have ruled on defendant's Confrontation Clause challenge had he objected when A.W. first began testifying on the first day of trial.

Defendant alternatively argues that his trial counsel was ineffective for failing to object on the first day of A.W.'s testimony.  We reject the ineffective assistance of counsel (IAC) claim.

To prevail on an IAC claim, the defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.  (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694;

9

accord, *People v. Johnson* (2015) 60 Cal.4th 966, 979-980; see *People v. Mbaabu* (2013) 213 Cal.App.4th 1139, 1148.)

"[R]arely will an appellate record establish ineffective assistance of counsel." (*People v. Thompson* (2010) 49 Cal.4th 79, 122.) If the record sheds no light on counsel's actions, the claim must be rejected unless no satisfactory explanation exists or counsel was asked for an explanation and failed to provide one. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) We will not find ineffective assistance of counsel "unless there could be no conceivable reasonable for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

We can think of several conceivable reasons why defense counsel may not have objected that defendant could not see A.W.'s when she testified. For one, defendant and defense counsel may not have been initially concerned that defendant could not see A.W. so long as defense counsel could see her. It is conceivable that defendant decided that he wanted to be able to see A.W. after she testified for a day. Defense counsel also may have thought it was in defendant's best interest that he not look at A.W. because he may have done so in an intimidating manner. As the trial court noted, the court would not "put [A.W.] in a position where she gets stared down" and overruled defense counsel's objection to the computer monitor covering her face in part because of "defendant's demeanor." Because defense counsel may have reasonably decided not to object that defendant could not see A.W.'s face on the first day of trial, we reject defendant's IAC claim.

### 3. *A.W.'s First Day of Testimony*

A.W.'s testimony on the first day of trial was sufficient for the jury to find defendant guilty beyond a reasonable doubt on counts 1 through 7.  A.W. testified that defendant trafficked her from Las Vegas to San Bernardino in order to pimp her.  She explained that defendant repeatedly threatened her, used violence, assaulted her with his gun, and detained her against her will, all to coerce her into prostituting herself for him.  A.W. also testified that T.W. prostituted herself and gave her earnings to defendant.

A.W.'s testimony on the first day of trial thus allowed the jury to find defendant guilty of trafficking A.W. to commit another crime (prostitution) (§§ 236.1, subd. (b), 266h; count 1), pimping A.W. (§ 266h; count 2), pandering by procuring for prostitution A.W. and T.W. (§ 266i, subd. (a)(1); counts 3 & 7); kidnapping A.W. (§ 207, subd. (a); count 4), assaulting A.W. with a firearm (§ 245, subd. (a)(2); count 5), and making criminal threats against A.W. (§ 422, subd. (a); count 6).  We therefore need not address whether the trial court properly overruled defendant's Confrontation Clause objection immediately before A.W. began testifying on the second day of trial that he could not see her face.

### B. *Sentence Imposed on Count 9*

Defendant contends, and the People concede, that the trial court erroneously imposed a 16-year term on count 9, pandering by procuring for prostitution a minor over 16 years old.  (§ 266, subd. (b)(1).)  We agree.

11

The trial court imposed the 16-year term by imposing an upper term of eight years for count 9, doubled for defendant's strike prior. The upper term for the offense, however, is six years. (§ 266, subd. (b)(1).) The upper term thus should have been six years, doubled for the prior strike, for a total of 12 years. We therefore modify the sentence on count 9 from a 16-year to a 12-year term. (See *People v. Guillen* (1994) 25 Cal.App.4th 756, 764.)

C. *Senate Bill No. 567*

The trial court imposed upper term sentences on counts 1, 2, 3, 4, 6, and 9. The court also imposed the upper term on the firearm enhancements in connection with counts 1, 5, and 6, and imposed the upper term on the great-bodily-injury enhancement in connection with count 1. Defendant contends the matter must be remanded for resentencing under recently enacted legislation so that the trial court can decide whether to impose these upper terms. We agree.

The court explained that it intended to impose the maximum term possible given the nature of defendant's offenses, the number of victims, and the length of time that he abused them. The court found that there were no mitigating factors, while there were three aggravating factors: (1) the victims were "particularly vulnerable," (2) the manner defendant carried out the offenses indicated "criminal sophistication and professionalism," and (3) he engaged in violent conduct that indicated a serious danger to society. (Cal. Rules of Court, rule 4.421(a)(3), (a)(8), (b)(1).)

12

"While this appeal was pending, Senate Bill No. 567 (2021-2022 Reg. Sess.) amended section 1170, subdivision (b), making the middle term of imprisonment the presumptive sentence. (§ 1170, subd. (b)(2); Stats. 2021, ch. 731, § 1, effective Jan. 1, 2022.) A trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)-(2).)" (*People v. Flores* (2022) 75 Cal.App.5th 495, 500, fn. omitted, review denied June 15, 2022 (*Flores*).)

The parties agree, as do we, that these ameliorative amendments apply retroactively to defendant's non-final case. (*Flores*, *supra*, 75 Cal.App.5th at p. 500; *People v. Lopez* (2022) 78 Cal.App.5th 459, 2022, review denied July 20, 2022 (*Lopez*); *People v. Zabelle* (2022) 80 Cal.App.5th 1098 (*Zabelle*).) The parties disagree, however, on the appropriate remedy. Defendant argues the case must be remanded so that the trial court may exercise its discretion under amended section 1170, subdivision (b) and decide whether to impose the middle or upper terms on the six counts at issue. The People argue any error was harmless because any reasonable jury would have found at least one of the aggravating circumstances true beyond a reasonable doubt and thus the trial court properly imposed the upper terms.

Courts are split on how to assess harmlessness in these circumstances. (See *Lopez*, *supra*, 78 Cal.App.5th at p. 497, fn. 11.) In *Flores*, Division Three of the First District held that remand for resentencing under amended section 1170, subdivision (b)

13

was unnecessary because any error in the trial court's imposing an upper term (instead of the presumptive middle term required by Senate Bill No. 567) was harmless. (*Flores*, *supra*, at p. 500.) The *Flores* court held reviewing courts may affirm an upper term, even if the defendant is entitled to the retroactive application of Senate Bill No. 567, so long as a reasonable jury would have found true "'at least a single aggravating circumstance'" justifying an upper term true beyond a reasonable doubt. (*Ibid*., quoting *People v. Sandoval* (2007) 41 Cal.4th 825, 839 (*Sandoval*).) The *Flores* court affirmed the defendant's upper term because a reasonable jury would have found true beyond a reasonable doubt the aggravating circumstances that he had "numerous convictions" and committed the underlying offense while on probation. (*Id*. at p. 501.)

Our colleagues in Division One recently disagreed with *Flores*. (*Lopez*, *supra*, 78 Cal.App.5th at p. 467, fn. 11.) The *Lopez* court held that assessing harmlessness in the context of retroactive application of Senate Bill No. 567 requires a two-step analysis. (*Ibid*.) The first question we ask is whether we "can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term." (*Ibid*.) The *Lopez* court reasoned that section 1170, subdivision (b)(2) "requires that every factor on which a court intends to rely in imposing an upper term, with the

14

exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury." (*Id*. at p. 466.)[4]

If the answer to the first question is "yes," then the trial court's "reliance on factors not found true by a jury in selecting the upper term" was harmless. (*Lopez*, *supra*, 78 Cal.Ap.5th at p. 467, fn. 11.) But if the answer to that question is "no," then the reviewing court must ask if it is reasonably probable that the trial court still would have imposed the upper term "if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied." (*Ibid*.) If it is not reasonably probable that the trial court would have imposed an upper term, then the reviewing court must remand the case for resentencing under amended section 1170, subdivision (b). (*Ibid*.)

In fashioning its test for harmlessness, the *Flores* court relied entirely on our Supreme Court's opinion in *Sandoval*. (See *Flores*, *supra*, 75 Cal.App.5th at p. 467.) But *Sandoval* was based on former section 1170, subdivision (b)'s language mandating

---

[4] Amended section 1170, subdivision (b)(2) provides in full: "The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense.

15

sentencing courts to impose the middle term "unless there are circumstances in aggravation." *Sandoval* held that a sentencing court's finding of aggravating circumstances justifying an upper term was harmless if a jury would have found a single aggravating circumstance true beyond a reasonable doubt. (*Sandoval*, *supra*, 41 Cal.4th at p. 839.)

But, as amended by Senate Bill No. 567, section 1170, subdivision (b) now provides that the sentencing court may impose an upper term "only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term." (§ 1170, subd. (b)(2).) "As a result of this change, it may no longer be true that 'the existence of a single aggravating circumstance is legally sufficient to make the defendant eligible for the upper term.'" (*Flores*, *supra*, 75 Cal.App.5th at p. 501 [conc. Statement of J. Liu].) Rather, an upper term is appropriate only if the aggravating circumstances "'justify the imposition' of that term under all of the circumstances, which may include evidence both in aggravation and in mitigation." (*Ibid*.)

The *Lopez* court correctly identified this change in the law by concluding that amended section 1170, subdivision (b) now "requires that *every factor* on which a court intends to rely in imposing an upper term, with the exception of factors related to a defendant's prior conviction(s), have been admitted by the defendant or proven to a jury." (*Lopez*, *supra*, 78 Cal.App.5th at p. 466, italics added.) The *Flores* court, on the other hand, relied on case law interpreting an outdated version of the statute, which allowed the

sentencing court to impose an upper term if the jury would have found at least one aggravating circumstance true beyond a reasonable doubt.

But under amended section 1170, subdivision (b), the sentencing court may impose the upper term only if all of the circumstances, including aggravating and mitigating circumstances, "justify the imposition" of that term. A single aggravating circumstance thus may be insufficient for a sentencing court to conclude that the upper term is justified under amended section 1170, subdivision (b). We therefore respectfully disagree with *Flores*.[5] (See *People v. Wandrey* (2022) 80 Cal.App.5th 962, 982 (*Wandrey*) [disagreeing with *Flores* and following *Lopez*]; *Zabelle*, *supra*, 80 Cal.App.5th at pp. 1113-1114 [agreeing with *Lopez* but "fram[ing] the issue somewhat differently" while noting "[b]oth our approach and the *Lopez* court's approach are the same in terms of outcomes"]; *People v. Dunn* (2022) 81 Cal.App.5th 394 (*Dunn*) [disagreeing with *Flores*], review granted Oct. 12, 2022, S275655.)

*Wandrey*, citing *Lopez*, stated the appropriate test slightly differently. (*Wandrey*, *supra*, 80 Cal.App.5th at p. 982.) The reviewing court asks whether it was "certain the jury would have found beyond a reasonable doubt the aggravating circumstances relied on by the court *and* whether the trial court would have exercised its discretion in the same way if it had been aware of the statutory presumption in favor of the middle term." (*Ibid.*)

---

[5] We also note that a different panel from the *Flores* court later declined to follow *Flores* and followed *Lopez*. (*People v. Ross* (2022) 86 Cal.App.5th 1346, 1354.)

17

In *Zabelle*, the Third District explained it "agree[d] in principle" with *Lopez* but had a "very minor" "quibble" with its test:  "[S]imilar to *Lopez*, we also apply a two-step process when evaluating for prejudice in these circumstances, with the first step evaluating for *Chapman* error[6] . . . and the second step evaluating for *Watson*[7] error. But unlike the *Lopez* court, we find a reviewing court must always evaluate for *Watson* error before concluding that the trial court's error was harmless."  (*Zabelle*, *supra*, 80 Cal.App.5th at p. 1113.)

The Fifth District agreed with *Lopez*'s two-step analysis, but disagreed on the appropriate standard of review at the first step.  (*Dunn*, *supra*, 81 Cal.App.5th at p. 408.) The court was "unconvinced that the *Chapman* standard of harmless error—applicable to errors implicating federal constitutional rights—must be applied to *all* aggravating circumstances in the *Lopez* court's first step."  (*Ibid*.)  The court noted that only one aggravating circumstance must be proved beyond a reasonable doubt under *Sandoval* and that *Lopez* relied on only section 1170, subdivision (b) as authority for its holding that "*Chapman* applies to every factor."  (*Ibid*.)

*Dunn* thus found that "*Flores* sets too low a standard for harmlessness and *Lopez* too high" and thus adopted "a version of the standard articulated in *Lopez*, modified to

---

[6]  See *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) [an error of federal law require reversal unless it is harmless beyond a reasonable doubt].)

[7]  See *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) [errors of state law require reversal only if it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

incorporate *Watson* in the first step." (*Dunn*, *supra*, 81 Cal.App.5th at p. 409.) *Dunn* articulated the appropriate test as follows: "The reviewing court determines (1)(a) beyond a reasonable doubt whether the jury would have found one aggravating circumstance true beyond a reasonable doubt and (1)(b) whether there is a reasonable probability that the jury would have found any remaining aggravating circumstance(s) true beyond a reasonable doubt. If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless. If not, the reviewing court moves to the second step of *Lopez*, (2) whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Dunn*, *supra*, at pp. 409-410, fn. omitted.)

In our view, the problem with these cases is that they do not properly account for our Supreme Court's decision in *People v. Gutierrez* (2014) 58 Cal.4th 1358, 1382 (*Gutierrez*), a case defendant's counsel relied on heavily at oral argument. Although *Lopez* cited and purportedly applied *Gutierrez*, we conclude below that it did not do so properly. (See *Lopez*, *supra*, 78 Cal.App.5th at p. 467.) The other cases did not cite *Gutierrez*.

In *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), the United States Supreme Court held that mandatory life without parole (LWOP) sentences for minors violate the

Eighth Amendment.  In *Gutierrez*, our Supreme Court considered whether a judicially created presumption that juvenile offenders convicted of special circumstance murder should receive LWOP sentences under section 190.5, subdivision (b), remained valid in light of *Miller*.  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1360.)  Before *Gutierrez*, the presumption created a preference for an LWOP sentence, thereby limiting the trial court's discretion to impose a more lenient sentence.  (*Id*. at pp. 1381-1381.)

Our Supreme Court concluded there was no such presumption in section 190.5, subdivision (b), but found that the statute remained constitutional after *Miller*.  (*Gutierrez*, *supra*, 58 Cal.4th at pp. 1360-1361.)  The court went on to explain that sentencing courts had discretion to impose an LWOP sentence on juvenile offenders convicted of special circumstances murder under section 190.5, "with no presumption in favor" of an LWOP sentence, but that the court had to consider various circumstances outlined in *Miller*.  (*Ibid*.)

The court then considered the proper disposition given that this change in the law applied retroactively and the two defendants in *Gutierrez* had been sentenced when the purported presumption in section 190.5, subdivision (b) was the "prevailing authority."  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1390.)  The *Gutierrez* court explained that sentencing decisions must be made with the sentencing court's "'informed discretion,'" and a court that is unaware of the scope of its discretion cannot exercise "'informed discretion.'"  (*Ibid.*)  Our Supreme Court held that remand is appropriate "[i]n such circumstances" unless the record "'clearly indicate[s]'" that the sentencing court would have imposed the

20

same sentence even if it knew of and exercised its informed discretion. (*Ibid.*) The record did not clearly indicate that the sentencing courts "would have imposed the same sentence had they been aware of the full scope of their discretion" and knew that there was no presumption in favor of an LWOP sentence in section 190.5, subdivision (b). (*Ibid.*) As a result, the *Gutierrez* court remanded for resentencing. (*Ibid.*)

S.B. 567's amendments to section 1170 present a situation analogous to the one in *Gutierrez*. As amended, section 1170, subdivision (b)(1) and (b)(2) expressly provide a presumption in favor of a middle term. Like the presumption at issue in *Gutierrez*, these statutory amendments circumscribe the sentencing court's discretion. They mandate a middle term unless certain conditions apply, just like the presumption disapproved of by *Gutierrez* limited the sentencing court's discretion to impose a sentence other than an LWOP term.

The various tests articulated above do not properly consider *Gutierrez*. *Flores* says any S.B. 567 error is harmless if the jury would have found at least one aggravating circumstance that the trial court relied on to impose an upper term true beyond a reasonable doubt. While rejecting *Flores*, the first step of *Lopez*'s two-part test says any S.B. 567 error is harmless if a jury would have found true beyond a reasonable doubt all of the aggravating circumstances the trial court relied on in imposing the upper term. *Dunn* modified this first step and says any S.B. 567 error is harmless if the jury would have found one aggravating circumstance true beyond a reasonable doubt and it is reasonably probable the jury would have found any other aggravating circumstances true.

21

In short, all three tests allow reviewing courts to find S.B. 567 error harmless only if the trial court *could have* lawfully imposed an upper term based on what a jury might have found true. But because amended section 1170, subdivision (b) affected the scope of a sentencing court's discretion, reviewing courts must determine whether the trial court *would have* imposed the same sentence in light of its narrowed discretion imposed by the new statute. (See *Gutierrez*, *supra*, 58 Cal.4th at p. 1391.)

*Lopez* seemingly recognized this principle when discussing and applying the second part of its test. (*Lopez*, *supra*, 78 Cal.App.5th at p. 467.) The court remanded for resentencing because the record did not "clearly indicate that the trial court would have exercised its discretion to impose an upper term based on an aggravating factor relating to Lopez's prior convictions." (*Id*. at p. 468.) But that is a different, more demanding standard than the second part of *Lopez*'s test, which asks only whether it is *reasonably probable* that the trial court would have imposed the same sentence "if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied." (*Id*. at p. 467, fn. 11.)

In short, reviewing the trial court's sentencing decisions for prejudice under *Watson* at *Lopez*'s step two does not answer whether the trial court would have imposed an upper term under amended section 1170, subdivision (b). This cannot be answered by determining whether the trial court's reliance on one or more aggravating circumstances was harmless. Whether a jury would have found true all of the aggravated circumstances

22

the trial court relied on true beyond a reasonable doubt (*Lopez* step one) does not answer whether the trial court *would have* imposed an upper term under amended section 1170, subdivision (b)'s new presumption in favor of a middle term. It answers only whether the sentence is constitutionally valid. (See *Sandoval*, *supra*, 41 Cal.4th at pp. 838-839; see also *People v. Black* (2007) 41 Cal.4th 799, 812.) Nor does asking at *Lopez* step two "whether we can be assured that the trial court *would have exercised its discretion to impose the upper term based on a single* permissible aggravating factor, or even two or three permissible aggravating factors . . . the court originally relied on both permissible and impermissible factors in selecting the upper term." (*Lopez*, *supra*, 78 Cal.App.5th at p. 467.)

As *Gutierrez* teaches, we may find that a sentencing court would have imposed an upper term under amended section 1170, subdivision (b)'s presumption for the middle term (and thus affirm the sentence without remanding) only if the record clearly indicates that the court would have imposed an upper term under its new, circumscribed discretion. *Lopez* thus did not ask the right question when, applying *Gutierrez*, it concluded reviewing courts must determine whether the record clearly indicates that the trial court would have imposed an upper term based on one or more aggravating factors that a jury would have found true beyond a reasonable doubt. (*Lopez*, *supra*, 78 Cal.App.5th at pp. 467-468.)

Defendants are entitled to sentencing decisions made in the "informed discretion" of the trial court. This requires a sentencing court to be aware of the full scope of its

23

discretion. A change in a mandatory sentencing presumption alters the sentencing court's discretion. For instance, the *Gutierrez* decision expanded a trial court's discretion to impose a sentence other than LWOP on certain juvenile offenders by eliminating a judicially imposed presumption that those offenders should receive an LWOP term. Amended section 1170, subdivision (b) restricts a trial court's discretion to impose an upper term in a way that did not exist under the former version of the statute. The imposition of an upper term under former section 1170, subdivision (b) thus does not constitute an exercise of the trial court's informed discretion under amended section 1170, subdivision (b). *Gutierrez* thus directs us to remand for resentencing unless the record clearly indicates that the trial court would have imposed the same sentence under the new law.

To summarize, there are two questions the reviewing court must ask to determine whether remanding for resentencing under amended section 1170, subdivision (b) is appropriate. First, we must ask whether a defendant *could* still lawfully be sentenced to an upper term under federal and state law. This requires us to conclude that the jury would have found at least one aggravating circumstance true beyond a reasonable doubt. (See *Sandoval*, *supra*, 41 Cal.4th at pp. 838-839; *Zabelle*, *supra*, 80 Cal.App.5th at pp. 1111-1112.) If the answer to that question is no, then the sentence is invalid and must be vacated, and the matter remanded for resentencing. (See *Sandoval*, *supra*, at pp. 838-839; *Zabelle*, *supra*, at pp. 1111-1112.) But if the answer to that question is yes, we ask whether the trial court *would* impose the same sentence in its informed discretion under

24

amended section 1170, subdivision (b).  To answer that question, we must apply

*Gutierrez* and ask whether the record *clearly indicates* that the trial court would have

imposed the same sentence under the new law.

Applying this two-part test here, we conclude remand is appropriate.  The trial

court found there were no mitigating circumstances while finding there were three

aggravating circumstances: (1) the victims were "particularly vulnerable," (2) the manner

defendant carried out the offenses indicated "criminal sophistication and

professionalism," and (3) he engaged in violent conduct that indicated a serious danger to

society.  (Cal. Rules of Court, rule 4.421(a)(3), (a)(8), (b)(1).)  We cannot find beyond a

reasonable doubt that a jury would have found any of these three true beyond a

reasonable doubt.

"'[A] "particularly vulnerable" victim is one who is vulnerable "in a special or

unusual degree, to an extent greater than in other cases."'"  (*People v. Esquibel* (2008)

166 Cal.App.4th 539, 558.)  "'Vulnerability means defenseless, unguarded, unprotected,

accessible, assailable, one who is susceptible to the defendant's criminal act.'"  (*People v.

DeHoyos* (2013) 57 Cal.4th 79, 154.)  A victim is considered particularly vulnerable

"where the age or physical characteristics of the victim, or the circumstances under which

the crime is committed, make the defendant's act especially contemptible."  (*People v.

Bloom* (1983) 142 Cal.App.3d 310, 321-322.)

"In the jargon of football players," an attack on a particularly vulnerable victim is

"a cheap shot."  (*People v. Smith* (1979) 94 Cal.App.3d 433, 436.)  Examples of

"particularly vulnerable victims" thus include individuals attacked while asleep (*People v. Loudermilk* (1987) 195 Cal.App.3d 996) or unconscious (*People v. Ramirez* (2006) 143 Cal.App.4th 1512), elderly victims who live alone attacked at home (*People v. Alvarado* (2001) 87 Cal.App.4th 178), and victims of gross vehicular manslaughter (*People v. Nicolas* (2017) 8 Cal.App.5th 1165).

Although the People highlight evidence suggesting that A.W., T.W., and Jane Doe were particularly vulnerable victims, there was also evidence suggesting that they were not. After meeting defendant, A.W. engaged in prostitution for another pimp and for herself. Jane Doe denied that she worked for any pimp, including defendant. T.W. similarly testified that she engaged in prostitution for herself only, not defendant, and denied that she ever gave him money she earned from her sex work. From this evidence, a reasonable jury could conceivably conclude that A.W., T.W., and Jane Doe were not unusually defenseless against defendant, but rather voluntarily engaged in prostitution. As the trial court put it, the victims were "streetwise." It is thus reasonably probable that a jury might not have found beyond a reasonable doubt that they were particularly vulnerable victims. (See *Sandoval*, *supra*, 41 Cal.4th at p. 841 [remanding in part because the record did not "reflect such a clear-cut instance of victim vulnerability that we confidently can conclude the jury would have made the same findings . . . ."]; *Wandrey*, *supra*, 80 Cal.App.5th at pp. 982-983 [remanding in part because jury could find that sexually abused 12-year-old girl was not particularly vulnerable].)

26

We are unaware of any published case that considers the aggravated circumstance that a defendant's conduct exhibited "criminal sophistication and professionalism." Although some evidence suggested that defendant acted "professionally" in that he organized and directed the victims' schedules and daily quotas, nothing about his conduct was particularly sophisticated. Defendant committed his offenses almost entirely by use of force and violence, not sophisticated methods. As defense counsel argued at sentencing, this was a relatively routine pimping case. A jury therefore could rationally find that defendant's conduct did not exhibit criminal sophistication or professionalism.

We are likewise unaware of any published case that meaningfully considers the aggravated circumstance of a defendant engaged in "violent conduct that indicated a serious danger to society." This uncertainty is compounded by the fact that what constitutes "violent conduct that indicated a serious danger to society" is vague and subjective. (See *People v. Sherman* (2022) 86 Cal.App.5th 402 [finding the circumstance requires a "subjective, qualitative determination[]"].) Our Supreme Court has observed that "to the extent a potential aggravating circumstance at issue in a particular case rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Sandoval*, *supra*, 41 Cal.4th at p. 840.) Given the ambiguity inherent in this aggravated circumstance, we cannot conclude beyond a reasonable doubt that the jury would have found it true beyond a reasonable doubt.

Because we are uncertain that a jury would have found any of the aggravated circumstances the trial court relied on true beyond a reasonable doubt, defendant's sentence is invalid under amended section 1170, subdivision (b). (See *Sandoval*, *supra*, 41 Cal.4th at p. 838; *Zabelle*, *supra*, 80 Cal.App.5th at p. 1111.) As a result, we need not turn to the second part of our test, but we elect to do so.

The court prefaced its ruling by stating that it intended to sentence defendant "to the maximum time permitted by law" and had "no problem" with doing so. The court described defendant as "a rather vicious predator who was proud of his profession," who showed an "absolute disregard for the physical, mental, and emotional well-being of the girls involved." In the court's view, defendant treated the victims "as nothing more than objects to be used for his financial enrichment and his own pleasure." The court was thus "shocked" at defendant's domination and "utter control" over the victims, as well as his treating them "without any care . . . other than with what they could do for him" for an extended period of time. His behavior, according to the trial court, was "beyond the bounds of a decent society" and showed that he was a "serious danger to society."

The court also found that there were no factors in mitigation, particularly given that there was "nothing that indicates" that defendant "had remorse for what happened to these girls," he tried to "get them to recant their testimony," and he "did everything he could to try to get out of trouble." The trial court thus found that the upper terms were "appropriate."

Although the trial court prefaced its ruling by stating that it intended to sentence defendant "to the maximum time permitted by law" and had "no problem" with doing so, nothing in the trial court's statements *clearly indicates* that it would have imposed an upper term under amended section 1170, subdivision (b), even if a jury found all three aggravated circumstances true. The trial court imposed an upper term based on three aggravated circumstances, but it did not expressly give any particular weight to any of them. And although the trial court expressed serious disdain for defendant's conduct, we cannot say for certain that the court would have imposed the same sentence under amended section 1170, subdivision (b)'s presumption for a middle term. "Some degree of speculation would necessarily be required for us to conclude . . . that the trial court would have exercised its sentencing discretion in the same way if it had taken the statutory presumption in favor of the middle term into account." (*Wandrey*, *supra*, 80 Cal.App.5th at p. 983.) Because the record does not clearly indicate that the trial court would have imposed the same sentence under amended section 1170, subdivision, we conclude remand for resentencing under that statute is appropriate.

## IV.

## DISPOSITION

The sentence on count 9 is ordered reduced to a 12-year term. As modified, the judgment of conviction is affirmed. Defendant's sentence is vacated and the matter for resentencing consistent with amended section 1170, subdivision (b). After resentencing defendant, the clerk of the superior court is directed to prepare an amended abstract of

judgment and forward a certified copy of the amended abstract to the Department of

Corrections and Rehabilitation.


CODRINGTON          
J.

I concur:


MILLER             
Acting P. J.

[*People v. Lewis*, E076449]

RAPHAEL, J., Concurring.

I respectfully concur separately because I would follow *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*) in remanding for resentencing.  I join the opinion and its result except for the portions of section III.C that apply analysis deviating from *Lopez*.

When Brandon Edward Lewis was sentenced, it was within the trial court's "sound discretion" to choose a sentence among the lower, middle, and upper term that "best serves the interests of justice."  (Penal Code § 1170, former subd. (b).)  Also, a defendant had no right to a jury determination of the facts that the court relied on in choosing the upper term.  (*People v. Sandoval* (2007) 41 Cal.4th 825, 844, 847.)  The court sentenced Lewis to the upper terms for some of his crimes after finding three aggravating factors listed in California Rules of Court, rule 4.421.

Later, Senate Bill No. 567, effective January 1, 2022, made the middle-term sentence presumptive and required jury findings (or stipulated facts) for each aggravating factor that a trial court relies on to select an upper-term sentence.  (Penal Code § 1170, subd. (b)(2).)  A court may still find the fact of a prior conviction without a jury.  (*Ibid.*)

The change in law applies retroactively, so we must determine whether it was harmless for the court to apply the upper term without jury findings on the underlying facts and without treating the middle-term as presumptive.  *Lopez* correctly holds that we must first decide whether we can "conclude beyond a reasonable doubt that a jury would have found true beyond a reasonable doubt *every factor on which the court relied*. . . ." (*Lopez*, *supra*, 78 Cal.App.5th at p. 466.)

1

*Lopez*'s first step is correct because, now that our state requires a jury finding for any fact that the trial court relies on to impose an upper-term sentence, the federal constitutional right to a jury determination attaches to every such finding. (See *Patterson v. New York* (1977) 432 U.S. 197, 211, fn.12 [federal jury right "has always been dependent on how a State defines the offense that is charged in any given case"]; *People v. Rivera* (2019) 7 Cal.5th 306, 333 [federal jury right on each element charged].) As the law, applied retroactively, makes it constitutional error for the trial court to have relied on facts not found by a jury, *Chapman v. California* (1967) 386 U.S. 18 requires that we determine beyond a reasonable doubt whether each error was harmless.

The majority correctly holds that we cannot conclude beyond a reasonable doubt that any of the three factors would be found by a jury. (Maj. opn., *ante*, at pp. 25-28.) We thus reverse, as we cannot be sufficiently certain that the jury will provide any factual basis to select an upper term. That ends this matter here. The People may prove aggravating factors to a jury on remand. If they succeed, the trial court may consider whether to base upper-term sentences on the factors that the jury found.

We need not discuss *Lopez*'s second step. The second step addresses what the *trial court* would have done, not what a jury would find. We would need to reach the second step if we concluded that a jury would have found any of the aggravating factors. Then, we could uphold the sentence if we could find that "the trial court would nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on" only the factors that we could conclude would have been found by a jury, with the middle term presumptive. (See *Lopez*, *supra*, 78 Cal.App.5th at

2

p. 467, fn.11). Consistent with how we review most non-constitutional errors, *Lopez* applies to this determination the familiar *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) standard that asks whether the result more favorable to the defendant is "reasonably probable." (*Lopez*, at pp. 467 & 467 fn.11.)

The majority opinion applies a different two-part test than *Lopez* applies. It couches the second step in a manner guided by *People v. Gutierrez* (2014) 58 Cal.4th 1354 (*Gutierrez*) and asks "whether the record *clearly indicates* that the trial court would have imposed the same sentence under the new law." (Maj. opn., *ante*, at p. 25.)

The "clear indication" standard applies when a trial court makes a sentencing decision without "awareness of the full scope of discretion" that it has. (*Gutierrez*, *supra*, 58 Cal.4th 1354, 1391.) That standard would apply when a retroactive change in law bestows new sentencing discretion on a trial court, such as the discretion to strike an enhancement. (See *People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.) In that situation, the appellate court may have no relevant record to review, as the trial court would not yet have exercised its discretion. The clear indication standard consequently requires an affirmance to be grounded in record evidence, rather than in speculation.

In contrast, Senate Bill No. 567 applies retroactively to trial courts that *did* exercise discretion. Because of the change of law, these trial courts may have relied to some extent on an improper factor. When a defendant claims that a trial court relied on inapplicable factors in support of a sentencing choice, the "reasonable probability" standard applies. (*People v. Scott* (1994) 9 Cal.4th 331, 354-355; see *People v. McDaniels* (2018) 22 Cal.App.5th 420, 426 [clear indication standard inapplicable to

3

deciding whether a court "is likely to repeat a choice it already made"].)  Like most harmlessness inquiries, this review of a court ruling is inherently an analysis of what the record indicates.  *Lopez* correctly applies the *Watson* "reasonable probability" standard to its second-step determination, though we need not reach that step here because reversal is required after the first step.

RAPHAEL

J.

4